UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

HORIZON HEALTHCARE SERVICES, INC.,  :   Case No. 08 CV 4428 (LTS) (RLE)
HORIZON HEALTHCARE OF NEW YORK,  :
INC. and RAYANT INSURANCE COMPANY OF :
NEW YORK f/k/a HORIZON HEALTHCARE
INSURANCE COMPANY OF NEW YORK,  :
  :
           Plaintiffs,  :   **DECLARATION OF**
  :   **JANE LAUER BARKER**
       - against -  :
  :
LOCAL 272 LABOR MANAGEMENT  :
WELFARE FUND,  :
  :
           Defendant.  :

------------------------------x

I, Jane Lauer Barker, under penalty of perjury and in lieu of affidavit as permitted

by U.S.C. § 1746, declare as follows:

1.      I am an attorney and a member of the firm of Pitta & Dreier LLP,

attorneys for defendant Local 272 Welfare Fund, sued herein as Local 272 Labor

Management Welfare Fund (the "Fund").

2.      The purpose of this Declaration is to put before the Court documents and

facts in opposition to the motion of plaintiffs Horizon Healthcare Services, Inc., Horizon

Healthcare of New York, Inc., and Rayant Insurance Company of New York f/k/a

Horizon Healthcare Insurance Company of New York ("plaintiffs" or "Horizon") to

remand the complaint to state court. I am fully familiar with the facts and circumstances

contained herein and make this declaration upon my personal knowledge.

3.      Annexed hereto as Exhibit "A" is the Summons and Complaint filed on

April 23, 2008 in the New York State Supreme Court, New York County.

4.    By Notice of Removal filed on May 12, 2008, this action was removed to this Court on the ground that the complaint is founded on a claimed right as to which federal law, the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA") completely preempts state law.  A copy of the Notice of Removal is annexed hereto as Exhibit "B."

5.    Removal of the action was based upon the allegations of the complaint which seeks a judgment for the Fund's alleged refusal to pay certain claims for benefits submitted to it for medical services provided by the New York Presbyterian Hospital System ("NYPHS") and Continuum Health Partners Systems ("Continuum") (collectively the "Hospitals") to participants and beneficiaries of the Fund.  Such claims are "completely preempted" by ERISA and are removable in the Second Circuit Court of Appeals.

6.    As is alleged in the Complaint, the Fund is an "employee welfare benefit plan" ("the Plan") within the meaning of Section 3(1) of ERISA, 29 U.S.C. Section 1002(1).  The Fund is administered by a Board of Trustees composed of an equal number of employer and employee representatives as required by Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5).

7.    The Fund provides, inter alia, medical benefits to workers of employers who have agreed, pursuant to collective bargaining agreements with Teamsters Local 272, to contribute to the Fund.  (Complaint, ¶¶ 2-3).

8.    The Fund, pursuant to Plan documents, receives claims for medical benefits from, and on behalf of, participants or beneficiaries of the Fund and renders determinations regarding benefits due under the terms of the Fund's Plan and pays

benefits to the participants or beneficiaries or to health care providers, as the case may be. Annexed hereto as Exhibit "C" is the Local 272 Welfare Fund Summary Plan Description ("SPD") description governing the Fund and the payment and processing of claims for services rendered to participants and beneficiaries.

A.     **The Complaint Seeks To Obtain a Remedy for the Hospitals**

9.     According to paragraph "1" of the complaint, the Fund failed to abide by its obligations to pay for services rendered to the Fund's beneficiaries and eligible dependents by the Hospitals.  While referring to a contract between the Fund and plaintiffs and to the Fund's alleged breach of it (Complaint ¶¶ 3, 4), the complaint does not attach a copy of the contract (nor do plaintiffs do so in their motion to remand), and does not reference any particular provisions of an alleged contract with plaintiffs that the Fund has breached.  As far as the Fund can determine at this time, there is no executed agreement between plaintiffs and the Fund, although the Fund does have a draft of an agreement.  (Portions of that draft are annexed hereto as Exhibit "D").

10.     The complaint contains lengthy and numerous paragraphs which do not appear to have any particular relevance or connection to the relief sought or to the particulars of the dispute.  However, the gravamen of the complaint is the allegation, repeated throughout, that the Fund has failed to pay the Hospitals for services rendered to beneficiaries and dependents of the Fund and that the Fund has paid the Hospitals less than the amounts that the Hospitals claim are owed for the services rendered to the Fund's beneficiaries and dependents. (Complaint ¶ 2).

11.     The amount that the Fund owes to the Hospitals is in dispute.  Annexed hereto collectively as Exhibit "E" are two summary spreadsheets provided to the Fund by

Horizon showing amounts claimed to be owed by the Fund to the listed hospitals within the NYPHS for services rendered by those hospitals to participants and beneficiaries of the Fund. The spreadsheet were prepared by the NYPHS and provided to the Fund by Horizon.

12.    The Fund was also provided by NYPHS with a detailed breakdown listing of the amounts claimed to be owed by the Fund to the hospitals for each particular participant or beneficiary who was provided service and the status of those claims. Those spreadsheets (which are not provided at this time because they contain identifying information about patients) show that some of the claims were denied because they failed to comply with the terms of the governing documents of the Fund, including the SPD. For example, according to the NYPHS' spreadsheets, claims were denied by the Fund for "no pre-certification," for lack of "medical necessity," due to "coordination of benefit" rules in the Fund's governing documents, and for the failure of the hospital to provide a copy of its published charges so that the Fund could verify the code and charge. Some of the denials, according to NYPHS, were appealed pursuant to the Fund's internal appeal procedure, and the hospital was awaiting a decision on the appeal.

13.    A meeting was held between Horizon, NYPHS, and the Fund, and their counsel, on November 20, 2007, to discuss claims in dispute. Thereafter, at the Fund's request, NYPHS provided further information to the Fund supporting the claimed charges on certain bills. In March, 2008, the Fund prepared an analysis of the claims which showed that many of the claims were defective, for example, no quantities or required codes were provided on the itemized bills so that the Fund was unable to establish whether the charges were proper, there were numerous instances where different charges

were billed to the Fund for the same medication or item given to the same patient on the same day, and in one case the hospital had already received payment of a bill from Medicare but was still demanding duplicate payment from the Fund.    Through the undersigned counsel, in April, 2008, the Fund provided to NYPHS a number of additional examples of what appear to be erroneous charges and the Fund offered to meet and discuss the group of claims that had already been examined by the Fund.  We have received no response from NYPHS to that letter.

**B.    Plaintiffs' Complaint Does Not Seek a Remedy for A Breach of an Agreement Between Plaintiffs and the Fund**

14.    According to the complaint, the only failure of the Fund which plaintiffs seek to remedy is the alleged failure to pay the amounts charged to the Fund by the Hospitals.  That does not implicate or involve in any way any arrangement or "contract" between plaintiffs and the Fund.

15.    As alleged in the complaint, plaintiffs provided to the Fund's participants and beneficiaries access to certain hospitals with which plaintiffs had negotiated certain discounted rates for services rendered by those hospitals.  (Complaint ¶ 12).  In exchange, the Fund paid Horizon an administrative fee.  (Complaint ¶ 17).  That is consistent with the draft agreement.  (Exh. D, p. 9, Art.IV.A).

16.    According to the complaint, the Fund is responsible for determining the eligibility of individuals as participants and is responsible for adjudicating all claims for services provided by the Hospitals.  (Complaint ¶ 18).  That is consistent with the draft agreement.  (Exh. D, p. 5, Art. III).

17.    The complaint alleges that it is the Fund's exclusive responsibility to pay claims and that Horizon only provides administrative services to the Fund.  (Complaint ¶¶ 15, 17, 18, 20, 27).  That is generally consistent with the draft agreement.

18.    According to the draft agreement, the Fund is to pay all participating providers in accordance with the Fund's "Plan of Benefits," *i.e.,* the SPD.  (Exh. D, p.6, ¶ B.3).  The Fund, upon its adjudication of a claim, is entitled to pay the claim or issue a notice of claim denial.  (Exh. D, P. 6, ¶ B.6).  Plaintiffs for their part are required to ensure that all of the participating providers accept payment from the Fund as full payment for covered services and that the Fund receives the full amount of all discounts, rebates, or adjustments granted by the participating providers to plaintiffs directly or indirectly related to covered services rendered to the Fund's participants and beneficiaries.  (Exh. D, p. 4, ¶ A.7, 8).  Further, in the event of a dispute between the Fund and a provider, plaintiffs are required to assist the Fund in resolving the dispute. (Exh. D, p. 7, ¶ B.8.b).

19.    The allegations of the complaint and the draft agreement establish that the Fund is the payor of the claims and was entitled to adjudicate the claims, to pay them, or to deny them, in full or in part, in accordance with its Plan of Benefits.  Plaintiffs were to provide to the Fund certain administrative services for a fee.  The complaint nowhere alleges that the Fund has failed to pay the monthly administrative fee to plaintiffs or in any other manner violated its agreement with plaintiffs, and the relief sought by plaintiffs has little or nothing to do with the alleged responsibilities and obligations of Horizon to the Fund and the Fund to Horizon.  Rather, the plaintiffs seek solely to act as collection agent for the Hospitals -- to hold the Fund responsible for the difference between what

the Hospitals charged for the services rendered to the Fund's beneficiaries and dependents and the amounts that the Fund has paid the Hospitals for those services. (Complaint, ad damnum clause ¶ 1).

20.    Indeed, the complaint makes it abundantly clear that plaintiffs are acting as agents of, or in privity with, the Hospitals in seeking monies allegedly owed to the Hospitals due to the Fund's denial of claims or failure to pay claims as billed in full. As alleged, due to the Fund's failure to pay all of the amounts that NYPHS claims it is owed, NYPHS commenced an arbitration proceeding against plaintiffs seeking payment of the claims. (Complaint, ¶ 3). Continuum is alleged to have threatened litigation against plaintiffs for "amounts owed by the Fund on outstanding claims," but Continuum has agreed allegedly to "look first to the Fund for payment of these allegedly outstanding claims, and only seek payment from Horizon if these efforts were not fruitful." (Complaint, ¶ 4). However, according to the complaint, Continuum will now look to plaintiffs for payment of the claims. *Id.*

21.    The only reference to any alleged breach of the Fund's agreement with plaintiffs is in paragraph 19 of the complaint, where plaintiffs allege that the Fund agreed that, in the event it paid any Hospital less than the amount to which it was entitled under the agreement, the Fund would promptly adjust the underpayment, and that it would indemnify plaintiffs against any claims related to the Fund's obligation under that agreement, including the obligation to pay claims submitted by the Hospitals. However, even as alleged in the complaint, and as shown by the SPD and the draft agreement, it is undisputable that the Fund was at all times the *final adjudicator of claims* and was entitled at all times to pay a claim or deny a claim pursuant to its Plan of Benefits.

22.     In light of the allegations and relief sought by the complaint, the Fund, by notice of motion dated and filed June 26, 2008, moved to dismiss the complaint pursuant to Fed. R. Civ. P. rule 12(b)(6) and (7) on the ground that 1) plaintiff failed to join necessary and indispensable parties -- namely the affected hospitals in NYPHS that claim to be owed the monies for services rendered to the Fund's participants and beneficiaries the Fund has allegedly failed to pay; and 2) counts Two, Three and Four of the complaint are preempted by federal law in that they seek to require the Fund to pay claims for benefits and/or damages for the failure to pay claims for benefits.

23.     By memo endorsed dated July 10, 2008, the Court granted plaintiff's request to hold the Fund's motion to dismiss in abeyance pending disposition of the motion to remand.

24.     Plaintiffs' attorneys have submitted to the Court copies of the parties' exchange of correspondence part of the informal efforts to resolve the parties' disputes required by the Court's Individual Practices, section 2.B.   (Exhibits attached to Certification of Peter J. Gallagher).   According to that section of the Court's rules, the parties' notice of motion must include a separate paragraph certifying that the movant or requesting party has used its best efforts to resolve informally the matters raised in the submission.   The disclosure of the actual letters is not required by the Court's rule and, we would submit, should not be included in plaintiffs' submission as such exchanges are meant to encourage settlement and discussion; attaching them to motion papers does the opposite.   Furthermore, in this case, plaintiffs' counsel has submitted to the Court not only the correspondence exchanged with respect to the instant motion to remand, but also *some, although not all,* of the correspondence exchanged in connection with the Fund's

motion to dismiss.   Indeed, the grounds for the motion to dismiss asserted by the Fund were modified in response to the parties' telephonic discussions, which are also not referenced in plaintiffs' submissions, but which were part and parcel of the parties' efforts to resolve their disputes.   Therefore, because the parties' exchanges of letters were intended to help settle their disputes and did result in a modification of their positions and, further, because the Fund's motion to dismiss is being held in abeyance by the Court, we request that the Court refrain from considering the exhibits to the Certification of Peter J. Gallagher.

WHEREFORE, declarant requests that the Court deny the motion to remand.

Dated: New York, New York
      July 14, 2008

JANE LAUER BARKER (JB 5436)

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

HORIZON HEALTHCARE SERVICES, INC.,  :
HORIZON HEALTHCARE OF NEW YORK,   :
INC., and RAYANT INSURANCE         :
COMPANY OF NEW YORK f/k/a HORIZON  :    Index No.    _____
HEALTHCARE INSURANCE COMPANY OF    :
NEW YORK,                          :
                                   :
                    Plaintiffs,    :         **SUMMONS**
                                   :
         v.                        :
                                   :
LOCAL 272 LABOR MANAGEMENT         :
WELFARE FUND,                      :
                                   :
                    Defendant.     :

---

**TO:**    Local 272 Labor Management Welfare Fund
           220 East 23rd St.
           New York, New York 10010

You are hereby summoned and required to serve upon Plaintiff an answer to the Complaint in this action within twenty (20) days after service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you for the relief demanded in the Complaint.

The basis of the venue designated is that Defendant has its principal places of business in New York County.

Dated:  New York, New York
        April 22, 2008

GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

By  _David Jay_____

NEW YORK
COUNTY CLERKS OFFICE

APR 2 3 2008

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

HORIZON HEALTHCARE SERVICES, INC.,  :
HORIZON HEALTHCARE OF NEW YORK,     :
INC., and RAYANT INSURANCE          :    Index No.
COMPANY OF NEW YORK f/k/a HORIZON   :
HEALTHCARE INSURANCE COMPANY OF     :
NEW YORK,                           :
                                    :
                    Plaintiffs,     :                **COMPLAINT**
                                    :
            v.                      :
                                    :
LOCAL 272 LABOR MANAGEMENT          :
WELFARE FUND,                       :
                                    :
                    Defendant.

---

     Plaintiffs Horizon Healthcare Services, Inc., Horizon Healthcare of New York,

Inc., and Rayant Insurance Company Of New York f/k/a Horizon Healthcare Insurance

Company of New York (collectively, "Horizon") allege the following as and for their

Complaint against Defendant Local 272 Labor Management Welfare Fund ("Fund").

### NATURE OF THE ACTION

    1.     This is an action brought by Horizon against the Fund for failing to abide

by its contractual obligations to pay certain rates for services rendered to the Fund's

beneficiaries and their eligible dependents by certain hospitals in both the New York

Presbyterian Hospital system (the "New York Presbyterian Hospitals") and the

Continuum Health Partners system ("Continuum") (collectively, the New York

Presbyterian Hospitals and Continuum will be referred to as the "Hospitals").

2.     For more than three years, the Fund's beneficiaries and their eligible dependents utilized Horizon's network of hospitals, including the New York Presbyterian Hospitals and Continuum, and the Fund paid the resulting claims without objection and at the agreed upon rates. However, the Fund has recently changed course and refused to abide by the terms of its agreement with Horizon. Specifically, the Fund has: (1) refused to pay the agreed rates for certain New York Presbyterian Hospitals claims and perhaps certain Continuum claims, asserting that an administrative error that caused Horizon to initially "misprice" certain claims absolves the Fund of its obligation to pay the claims at the contracted rate; and (2) flatly refused to either pay, or provide the required justification for its failure to pay, certain outstanding New York Presbyterian Hospital and Continuum Hospital claims. Despite being notified of the outstanding issues and amounts due to the Hospitals, and being offered countless opportunities by the Hospitals and Horizon to resolve these issues amicably, the Fund continues to refuse to pay the amount required by its contract with Horizon. The Fund has most recently refused to respond to a specific request from Continuum to review a spreadsheet of outstanding claims and advise Horizon of the status of its review.

3.     As a result of Defendant's breach of its contract with Horizon, the New York Presbyterian Hospitals commenced an arbitration proceeding against Horizon before the American Health Lawyers Association seeking payment for the claims. The New York Presbyterian Hospitals allege that their contracts with Horizon require Horizon to ensure that the Fund's pay all claims for services rendered to Fund members at the appropriate contract rate.

2

4.    As a result of Defendant's breach of its contract with Horizon, Continuum has also made claims against Horizon and threatened litigation against Horizon for amounts owed by the Fund on outstanding claims. However, recognizing that the Fund retained exclusively responsibility for paying claims for its beneficiaries and their dependents, Continuum agreed to look first to the Fund for payment of these allegedly outstanding claims, and only seek payment from Horizon if these efforts were not fruitful. Despite reasonable efforts by Continuum to notify the Fund of these issues and resolve the outstanding claims, the Fund has not responded to Continuum. Continuum will now look to Horizon for payments of the claims.

5.    Horizon thus brings this action for damages and declaratory relief arising from Defendant's wrongful conduct and breach of its obligations to Horizon, and for such other and further equitable and legal relief as the Court deems just and proper.

## THE PARTIES

6.    Plaintiff Horizon Healthcare Services, Inc. ("HHS") is a non-profit health service corporation with its principal place of business in Newark, New Jersey.

7.    At all relevant times, Plaintiffs Horizon Healthcare of New York, Inc. and Rayant Insurance Company Of New York f/k/a Horizon Healthcare Insurance Company of New York were indirect, wholly-owned subsidiaries of HHS, and had their principal place of business at 1180 Avenue of the Americas, New York, New York.

8.    Defendant Local 272 Labor Management Welfare Fund is an employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), and has its principal place of business at 220 East 23rd St., New York, New York.

3

## JURISDICTION AND VENUE

9.      In accordance with Sections 301 and 302 of the New York Civil Practice Law and Rules, this Court has personal jurisdiction over Defendant because it has its principal places of business in New York County and because it transacted business within the State of New York.

10.     Venue is proper pursuant to Section 503 of the New York Civil Practice Law and Rules because Defendant has its principal places of business in New York County.

## ALLEGATIONS COMMON TO ALL COUNTS

**I.      Horizon's Participation In The New York Market For Healthcare Coverage**

11.     Horizon is one of the largest health insurance and managed care organizations in the New York/New Jersey area.  In recognition of Horizon's market strength and the anticipated growth of its business into the New York State market in the late 1990's, many New York hospitals, including the New York Presbyterian Hospitals and Continuum, entered into individual Network Hospital Agreements ("NHAs") with Horizon.

12.     The NHAs required the Hospitals to provide healthcare services to individuals eligible for coverage under Horizon health benefit plans at negotiated rates in exchange for being permitted to join Horizon's provider network and take advantage of the anticipated increased numbers of patients the hospitals would receive as a result.  In addition, Horizon agreed to include the hospitals in its published list of "Network Hospitals" and promote the use of these "Network Hospitals" to individuals enrolled in its health benefit plans.

4

13.    As a result of its efforts, Horizon was able to establish a panel of hospitals, physicians, specialists, and other healthcare providers throughout New York and New Jersey for individuals enrolled in its health benefit plans.

14.    Prior to 2001, Horizon's efforts in the New York market were focused exclusively on developing and expanding its fully insured business.  Under this delivery method, an employer enters into an insurance contract with, and pays a premium to, Horizon and in return Horizon assumes the financial risk of paying claims to the hospitals or other healthcare providers for enrollees in an insured plan.

## II.    Horizon Expands Its Efforts In The New York Market And Enters Into A Contract With The Fund

15.    In 2001, Horizon expanded its efforts in the New York market to include partially or fully administered self-insured healthcare business.  Under this delivery method, an employer or health and welfare fund acts as its own insurer and uses Horizon to partially or wholly administer its group benefit plan by, among other things, providing certain administrative services to the group and allowing its employees or beneficiaries and their eligible dependents, access to Horizon's network of hospitals at rates negotiated between Horizon and the hospitals.  Under this approach, the contract between the employer, group, or health/welfare fund and Horizon is not an indemnity insurance contract but a contract to pay for services rendered. In other words, the employer, group, or fund pays Horizon for its services but remains completely at risk for payment of actual claims incurred by those individuals covered under the health benefits plan. .

5

16.    In furtherance of its efforts to expand its business in the self insured market, Horizon began marketing to self-insured union welfare benefit funds throughout the New York metropolitan area. As a result, Horizon would provide eligible fund beneficiaries and their eligible dependents access to its Network Hospitals and perform certain administrative services, but would not assume the fund's financial responsibility for payment of claims.

17.    Horizon offered this business model to the Fund, and, in or around June 1, 2003, the Fund entered into an agreement with Horizon for administrative services (the "Agreement"). Under the terms of the Agreement, the Fund was responsible for, among other things, determining and verifying the eligibility of Fund beneficiaries and their eligible dependents, receiving, adjudicating and processing all claims for services provided by Horizon's Network Hospitals, paying claims for services rendered to its beneficiaries and their eligible dependents, and processing benefit appeals.

18.    When they entered into the Agreement, and at all times thereafter, both Horizon and the Fund understood that the Fund was not a fully-insured customer and thus assumed full responsibility for payment of claims for services rendered by health care service providers to its beneficiaries and their eligible dependents. The parties' agreement is set forth in a written agreement and further confirmed by the course of conduct between the parties over several years. Unlike a fully-insured customer, the Fund did not pay premiums to Horizon that would have justified Horizon agreeing to assume any liability for payment but rather paid a monthly administrative fee that was much less than a fully-insured premium. Moreover, throughout the term of the

6

Agreement, the Fund processed and paid claims submitted by the hospitals and never tendered these claims to Horizon for payment.

19.     The Fund further acknowledged its exclusive liability for the payment of claims by: (1) agreeing that in the event the Fund paid any hospital less than the amount to which it was entitled under the Agreement, the Fund would promptly adjust the underpayment and provide written notice to Horizon and the hospital of the adjustment; and (2) agreeing to indemnify and hold harmless Horizon against any claims related to the obligations that the Fund had assumed under the Agreement, including the obligation to pay claims submitted by Horizon's Network Hospitals.

### III.     The Performance Of The Contract Between Horizon And The Fund

20.     The Fund fully understood that it was obligated to pay for services performed for Fund beneficiaries and their eligible dependents. The health and welfare benefit plan identification cards issued to the Fund's beneficiaries directed that all claims were to be submitted by the hospitals directly to the Fund. The Fund would then determine whether the patient was eligible under the Fund's health and welfare benefit plan and whether the services rendered were covered under the plan. If the patient was eligible and the services were covered, the Fund would then price the claim based on Horizon's rates, remit payment for the claim directly to the hospital at the rates contracted for by Horizon, and the Fund would issue an Explanation of Benefits form directly to the Fund beneficiary.

7

21.    The rates at which claims were paid by the Fund under the Agreement were the rates that Horizon had negotiated with the Hospitals. These rates were typically based on a "percentage of charges" calculation, which meant that every claim received by the Fund was paid at a set, discounted percentage off of the hospital's published charges. The amount to be paid by the Fund was simply a matter of arithmetic -- discounting the charges submitted by the hospital by a certain, fixed percentage.

22.    As of June 1, 2005, claims submitted to the Fund were paid at 85% of the hospitals' published charges. Late in 2006, the percentage rose to 90% of charges. The Fund was notified of this adjustment when it was made.

## IV.    The Fund Breaches The Agreement

### A.    New York Presbyterian Hospitals

23.    For several years, the process described above was followed by the hospitals, the Fund and Horizon for the overwhelming majority of claims submitted for services rendered to Fund beneficiaries and their eligible dependents.

24.    Nonetheless, on occasion, certain of the New York Presbyterian Hospitals would submit claims directly to Horizon instead of to the Fund. In such instances, Horizon could have returned the claim to the hospital with instructions to resubmit the claim to the Fund. However, in an effort to avoid unnecessary delays in the processing or payment of claims for Fund beneficiaries and their eligible dependents, Horizon "priced" these claims for the Fund through its own processing systems and, in turn, submitted the "priced" claims to the Fund for payment.

8

25.     Unfortunately, due to a systemic administrative error, a limited number of the claims that were submitted directly to Horizon were priced at an incorrect rate, far below the amount that the Fund was obligated to pay under the Agreement.

26.     The Fund knew, or should have known, when it received these claims from Horizon that they had been mispriced, as the amount calculated by Horizon was in many instances significantly lower than the 85% or 90% of the original charges that the Fund was obligated to pay, and had been paying, on claims submitted to it by the same hospitals. Nonetheless, the Fund paid these claims at the improper rate.

27.     In February 2007, the New York Presbyterian Hospitals filed an arbitration demand against Horizon with the American Health Lawyers Association seeking to, among other things, recoup the difference between the amounts paid by the Fund and the proper amounts due and owing by the Fund under the Agreement.

28.     The New York Presbyterian Hospitals have argued that their agreements with Horizon require Horizon to either guarantee payment of claims for self-insured beneficiaries and their eligible dependents or ensure that payment is made by employers and other self-insured health and welfare funds with whom Horizon does business. The New York Presbyterian Hospitals' allegations involved claims for Fund beneficiaries and their eligible dependents as well as of a number of other union welfare benefit plans.

29.    When the New York Presbyterian Hospitals filed the arbitration, Horizon notified each of the welfare benefit funds involved regarding the discrepancy in the pricing of the limited number of mispriced claims and demanded that each fund pay the appropriate amount to the hospitals under their agreements with Horizon. The majority of funds acknowledged their obligations, and Horizon is working with these funds to resolve the issues involving any additional monies owed on these outstanding claims.

30.    Notwithstanding the foregoing, the Fund has refused to acknowledge its obligations under the Agreement and claims that it is not liable for any amounts above which they have already paid, either for those claims that Horizon mistakenly told them to pay at a greater discount than what they were contractually obligated to pay or those claims for which underpayment was alleged by the New York Presbyterian Hospitals as a result of certain administrative issues.

31.    The Fund has also refused to engage in good faith discussions with Horizon and/or the Hospitals regarding certain claims that remain unpaid or underpaid as a result of administrative determinations, such as the failure to obtain pre-certification or pre-approval for certain services.

32.    Despite repeated offers to assist the Fund to properly reconcile these claims and resolve the dispute with the New York Presbyterian Hospitals, and repeated demands for payment, the Fund refuses to abide by the Agreement and pay these claims to the New York Presbyterian Hospitals at the contracted rate.

10

33.    As a result, Horizon has been forced to incur significant costs to defend itself against the New York Presbyterian Hospitals' allegations and will be forced to satisfy any judgment that may be entered against Horizon in the arbitration for monies owed by the Fund as a result of the conduct described above.

B.    Continuum

34.    In or around November 2006, Continuum notified Horizon of certain issues arising out its agreements with Horizon.  Although it never ultimately filed suit, Continuum threatened litigation against Horizon seeking to recover, among other things, amounts due and owing for services rendered by Continuum to Fund beneficiaries and their eligible dependents as well as members and eligible beneficiaries of a number of other union welfare benefit plans.

35.    As was the case with the New York Presbyterian Hospitals, Continuum has argued that Horizon is required to either guarantee payment of claims for self-insured beneficiaries and their eligible dependents or ensure that payment is made by employers and other self-insured health and welfare funds with whom Horizon does business.

36.    During the course of this dispute, the nature of Horizon's relationship with the Fund became clear to Continuum, namely that the Fund was not a fully-insured customer and was thus responsible for payment of claims for services rendered by Continuum to its beneficiaries and their eligible dependents.

11

37.    Recognizing that the Fund retained exclusively responsibility for paying claims for its beneficiaries and their dependents, Continuum agreed to first seek payment directly from the Fund for any outstanding claims.  Under this process, Continuum agreed to send to the Fund accounts receivable information setting forth all of the amounts due and demanding payment and/or justification for the Fund's failure to pay the outstanding claims.  Only if the Fund failed to respond to this demand or provide reasonable defenses to the claims would Continuum seek payment from Horizon for these claims.

38.    Pursuant to his arrangement, Continuum has notified the Fund of its outstanding obligations but has received no response.  In the absence of any response, Continuum will now seek payment for these claims from Horizon.

39.    Despite repeated offers to assist the Fund to properly reconcile these claims and resolve the dispute with Continuum, and repeated demands for payment, the Fund refuses to abide by the Agreement, respond to Continuum's claims request,  and pay these claims to Continuum at the contracted rate.

40.    As a result, Horizon has been forced to incur significant costs to defend itself against Continuum's allegations and will be forced to satisfy any claims that may be made against Horizon for monies owed by the Fund as a result of the conduct described above.

12

## COUNT ONE
### (Breach of Contract)

41.    Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

42.    The Fund was required under the Agreement to make payments to the Hospitals at the rates negotiated by Horizon with the Hospitals.

43.    The Fund has breached its obligations under the Agreement by paying less than they were required to pay for certain claims submitted by the Hospitals for services rendered by the Hospitals to the Fund's beneficiaries and their eligible dependents.

44.    Horizon has made demand upon the Fund for payment of these sums, but the Fund refuses to pay.

45.    Horizon has adequately and timely performed all of its obligations under the Agreement.

46.    As a direct and proximate result of the Fund's wrongful conduct, Horizon has suffered, and will continue to suffer, damages in an amount to be proved at trial

## COUNT TWO
### (Breach of Duty of Good Faith and Fair Dealing)

47.    Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

48.    Implied in every contract performed in New York is a covenant of good faith and fair dealing which requires the parties to a contract to deal fairly and in good faith with one another.  The Agreement is a contract performed in New York and is therefore subject to this implied duty of good faith and fair dealing.

49.     By engaging in the acts and omissions described above, especially with respect to its failure to pay the contracted amounts for services rendered to its beneficiaries and their eligible dependents by the Hospitals, the Fund has breached, and continues to breach, the implied duty of good faith and fair dealing in the Agreement.

50.     As a direct and proximate result of the Fund's failure to deal in good faith, Horizon has suffered, and will continue to suffer, damages in an amount to be proved at trial.

## COUNT THREE
### (Unjust Enrichment)

51.     Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

52.     The Fund intentionally paid less than it was required to pay for certain claims submitted by the Hospitals, as it knew or should have known that the amount at which it paid these claims was significantly lower than the rate at which it agreed to pay them.

53.     It would be unjust and inequitable to allow the Fund to retain the monies it wrongfully retained by failing to abide by its contractual obligations and to ensure that full payment was remitted to the Hospitals for services rendered to the Fund's beneficiaries and their eligible dependents.

54.     As a direct and proximate result of the Fund's wrongful acquisition and retention of these monies, Horizon has suffered, and will continue to suffer, damages in an amount to be proved at trial.

14

## COUNT FOUR
### (Prima Facie Tort)

55.     Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

56.     The Fund intended to cause Horizon harm by failing to pay the appropriate rates for services rendered by the Hospitals to the Fund's beneficiaries and their eligible dependents, and succeeded in doing so.

57.     The Fund paid less than it was required to pay for certain claims submitted by the Hospitals, when it knew or should have known that the amount at which it paid these claims was significantly lower than the rate at which it agreed to pay them.

58.     The Fund intended that this conduct would cause harm to Horizon and/or knew with certainty that its conduct would cause harm to Horizon.

59.     The conduct described above was not justifiable under any circumstances.

60.     As a direct and proximate result of the Fund's conduct, Horizon has suffered, and will continue to suffer, damages in an amount to be proved at trial.

## COUNT FIVE
### (Declaratory Judgment)

61.     Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

62.     This is a cause of action for declaratory relief pursuant to CPLR 3001 and 3007. Horizon seeks a judicial determination of the parties' rights under the Agreement. The issuance of the requested declaration will resolve the controversy between the parties over the correct interpretation and application of the Agreement

15

63.    The Fund has wrongfully failed and refused to remit payment to the Hospitals in the amounts previously agreed to by the parties, in violation of the Fund's obligations under the Agreement, and refused to defend and indemnify Horizon against the claims made against Horizon by the New York Presbyterian Hospitals in the Arbitration.

64.    An actual and justiciable controversy presently exists regarding the Fund's obligations under the Agreement, including without limitation its indemnity obligations.

65.    Horizon does not have an adequate remedy at law, and will continue to be harmed and damaged unless this Court enters appropriate temporary, preliminary and final injunctive relief.

**WHEREFORE**, Horizon demands judgment against the Fund as follows:

1.    That the Fund be ordered to pay the differential between what was paid to the Hospitals for services rendered by the Hospitals to Fund beneficiaries and their eligible dependents and what should have been paid under the Agreement.

2.    That the Fund be ordered to pay any damages that the New York Presbyterian Hospitals may be awarded in the arbitration in connection with the claim that Horizon is liable for the difference between what the Fund paid for services rendered to the Fund's beneficiaries and their eligible dependents by the Hospitals and the contracted rates between Horizon and the Hospitals.

3.    That the Fund be ordered to reimburse any damages or other amounts that Horizon pays the Hospitals for the difference between what the Fund paid for services rendered to the Fund's beneficiaries and their eligible dependents and the contracted rates between Horizon and the Hospitals.

16

4.      That the Fund be ordered to pay Horizon's reasonable attorneys' fees and the costs and disbursements in connection with its defense of the arbitration brought by the New York Presbyterian Hospitals in connection with the conduct described above.

5.      That compensatory, consequential and punitive damages be awarded in favor of Horizon and against the Fund, together with interest thereon.

6.      That Horizon be granted such other relief against the Fund as this Court deems just and proper.

Dated: New York, New York
       April 22, 2008

GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

By _____
   David Jay

17

# EXHIBIT B

# JUDGE SWAIN

PITTA & DREIER LLP
499 Park Avenue
New York, New York 10022
(212) 652-3890
BRUCE COOPER (BC 2764)
JANE LAUER BARKER (JB 5436)
*Attorneys for Defendant Local 272 Welfare Fund*

## 08 CV 4428

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



R E C E I V E D
MAY 1 2 2008
U.S.D.C. S.D.N.Y.
CASHIERS

HORIZON HEALTHCARE SERVICES, INC.,
HORIZON HEALTHCARE OF NEW YORK, INC. and
RAYANT INSURANCE COMPANY OF NEW YORK
f/k/a HORIZON HEALTHCARE INSURANCE
COMPANY OF NEW YORK,

<u>NOTICE OF REMOVAL</u>

           Plaintiffs,

Civil Action No.

- against -

LOCAL 272 LABOR MANAGEMENT WELFARE
FUND,

           Defendant.

       Defendant, LOCAL 272 WELFARE FUND (the "Fund"), sued herein as LOCAL

272 LABOR MANAGEMENT WELFARE FUND, by its attorneys, Pitta & Dreier LLP,

respectfully alleges as follows:

## <u>PRELIMINARY STATEMENT</u>

      1.     The Fund submits this notice of removal pursuant to 28 U.S.C. §§ 1331,

1441 (b) and 1446 to remove the above-referenced civil action to this Court from the

Supreme Court of the State of New York, County of New York, on the ground that the

action is founded on a claimed right as to which federal law completely preempts state

law.

{00353109.DOC;}

## STATEMENT OF GROUNDS FOR REMOVAL

2.      This Court has original jurisdiction of this action pursuant to sections 502(a), (e) and (f) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. Section 1132(a), (e) and (f).

3.      Pursuant to 28 U.S.C. § 1446(b), this notice of removal is timely as it is filed within 30 days after the receipt by the Fund of a copy of the Summons and Complaint on or about April 23, 2008.  A copy of the Summons and Complaint is annexed hereto as Exhibit "A".

4.      Venue is proper in this district court pursuant to 28 U.S.C. § 1446(a) as this action is pending in the County of New York which is within the Southern District of New York.

5.      The Fund is administered by a Board of Trustees composed of an equal number of employer and employee representatives as required by Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5).

6.      As is alleged in the Complaint, the Fund is an "employee welfare benefit plan" ("the Plan") within the meaning of Section 3(1) of ERISA, 29 U.S.C. Section 1002(1).  The Fund provides, inter alia, medical benefits to workers of employers who have agreed, pursuant to collective bargaining agreements with Teamsters Local 272, to contribute to the Fund.  (Complaint, ¶ ¶ 2-3).

7.      The Fund, pursuant to Plan documents, receives claims for medical benefits from, and on behalf of, participants or beneficiaries of the Fund and renders determinations regarding benefits due under the terms of the Fund's Plan and pays benefits to the participants or beneficiaries or to health care providers, as the case may be.

8.      Plaintiffs, as alleged in the Complaint, had an agreement with Presbyterian Hospitals and Continuum (the "hospitals") to provide to the hospitals numbers of patients, including individuals enrolled in ERISA plans, such as the Fund's Plan. (Complaint, ¶¶ 11-12).

9.      As alleged in the Complaint, participants and beneficiaries of the Fund received health care services in the hospitals and the Fund received claims for benefits on behalf of those participants and beneficiaries and made determinations regarding the appropriate amount of benefits to be paid to the hospitals under the terms of its Plan. (Complaint, ¶¶ 17, 20).

10.     Plaintiffs allege that the Fund has failed to pay the proper amounts for services rendered by the Presbyterian Hospitals and Continuum. (Complaint, ¶¶ 2, 32, 39).

11.     Plaintiffs allege that the Fund's failure to pay the proper amounts for services rendered by the hospitals to the participants and beneficiaries of the Fund constitutes a breach of contract, unjustly enriches the Fund, and constitutes a prima facie tort. (Complaint, ¶¶ 42-60). Plaintiffs seek as relief, *inter alia,* that the Fund be ordered to pay the hospitals the alleged proper amounts for the services rendered by the hospitals to the participants and beneficiaries of the Fund.

12.     ERISA completely preempts state common law or statutory laws that "relate to" ERISA plans. Where a federal statute completely preempts state law causes of action, such causes of action are necessarily federal in character and can be removed. *Aetna Health Inc. v. Davila,* 542 U.S. 200 (2004).

12. Section 514(a) of ERISA, 29 U.S.C. § 1144(a), completely preempts state common law and statutory claims for benefits due under the terms of employee welfare benefit plans or that provide alternative remedies to ERISA's enforcement mechanisms. *Aetna Health Inc. v. Davila,* 542 U.S. 200 (2004); *Pilot Life Insurance Company v. Dedeaux,* 481 U.S. 41 (1987).

13. Section 514(a) of ERISA, 29 U.S.C. §1144(a), completely preempts state common law and statutory claims that are predicated on the existence of an ERISA plan. *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133 (1990).

14. Section 514(a) of ERISA, 29 U.S.C. § 1144(a), completely preempts state common law and statutory claims that dictate the manner in which ERISA plans are administered or mandate whether and how benefits are to be paid by an ERISA plan. *FMC Corp. v. Holliday,* 498 U.S. 52 (1990); *Boggs v. Boggs,* 520 U.S. 833 (1997).

12. Based upon the foregoing, the Complaint arises under federal law within the meaning of 28 U.S.C. § 1331 and 1441(b). *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58 (1987).

WHEREFORE, removal of plaintiffs' complaint to this Court is proper pursuant to 28 U.S.C. § 1331 and 1441(b).

Dated: May 12, 2008
New York, New York

Respectfully submitted,
PITTA & DREIER LLP
*Attorneys for Defendant Local 272*
*Welfare Fund*

By:
Jane Lauer Barker (JB 5436)
499 Park Avenue
New York, New York 10022
(212) 652-3890

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

HORIZON HEALTHCARE SERVICES, INC.,
HORIZON HEALTHCARE OF NEW YORK,
INC., and RAYANT INSURANCE
COMPANY OF NEW YORK f/k/a HORIZON
HEALTHCARE INSURANCE COMPANY OF
NEW YORK,

                           Plaintiffs,

                v.

LOCAL 272 LABOR MANAGEMENT
WELFARE FUND,

                           Defendant.

---

Index No. _____

**SUMMONS**

TO:    Local 272 Labor Management Welfare Fund
       220 East 23rd St.
       New York, New York 10010

You are hereby summoned and required to serve upon Plaintiff an answer to the Complaint in this action within twenty (20) days after service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you for the relief demanded in the Complaint.

The basis of the venue designated is that Defendant has its principal places of business in New York County.

Dated: New York, New York
       April 22, 2008

GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

By _____
       David Jay

NEW YORK
COUNTY CLERK'S OFFICE

APR 23 2008

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| HORIZON HEALTHCARE SERVICES, INC., :<br>HORIZON HEALTHCARE OF NEW YORK, :<br>INC., and RAYANT INSURANCE :<br>COMPANY OF NEW YORK f/k/a HORIZON :<br>HEALTHCARE INSURANCE COMPANY OF :<br>NEW YORK, : | Index No. |

Plaintiffs,

v.                                                                    **COMPLAINT**

LOCAL 272 LABOR MANAGEMENT
WELFARE FUND,

Defendant.

Plaintiffs Horizon Healthcare Services, Inc., Horizon Healthcare of New York, Inc., and Rayant Insurance Company Of New York f/k/a Horizon Healthcare Insurance Company of New York (collectively, "Horizon") allege the following as and for their Complaint against Defendant Local 272 Labor Management Welfare Fund ("Fund").

## NATURE OF THE ACTION

1.      This is an action brought by Horizon against the Fund for failing to abide by its contractual obligations to pay certain rates for services rendered to the Fund's beneficiaries and their eligible dependents by certain hospitals in both the New York Presbyterian Hospital system (the "New York Presbyterian Hospitals") and the Continuum Health Partners system ("Continuum") (collectively, the New York Presbyterian Hospitals and Continuum will be referred to as the "Hospitals").

2.    For more than three years, the Fund's beneficiaries and their eligible dependents utilized Horizon's network of hospitals, including the New York Presbyterian Hospitals and Continuum, and the Fund paid the resulting claims without objection and at the agreed upon rates.  However, the Fund has recently changed course and refused to abide by the terms of its agreement with Horizon.  Specifically, the Fund has: (1) refused to pay the agreed rates for certain New York Presbyterian Hospitals claims and perhaps certain Continuum claims, asserting that an administrative error that caused Horizon to initially "misprice" certain claims absolves the Fund of its obligation to pay the claims at the contracted rate; and (2) flatly refused to either pay, or provide the required justification for its failure to pay, certain outstanding New York Presbyterian Hospital and Continuum Hospital claims.  Despite being notified of the outstanding issues and amounts due to the Hospitals, and being offered countless opportunities by the Hospitals and Horizon to resolve these issues amicably, the Fund continues to refuse to pay the amount required by its contract with Horizon.  The Fund has most recently refused to respond to a specific request from Continuum to review a spreadsheet of outstanding claims and advise Horizon of the status of its review.

3.    As a result of Defendant's breach of its contract with Horizon, the New York Presbyterian Hospitals commenced an arbitration proceeding against Horizon before the American Health Lawyers Association seeking payment for the claims.  The New York Presbyterian Hospitals allege that their contracts with Horizon require Horizon to ensure that the Fund's pay all claims for services rendered to Fund members at the appropriate contract rate.

2

4.    As a result of Defendant's breach of its contract with Horizon, Continuum has also made claims against Horizon and threatened litigation against Horizon for amounts owed by the Fund on outstanding claims. However, recognizing that the Fund retained exclusively responsibility for paying claims for its beneficiaries and their dependents, Continuum agreed to look first to the Fund for payment of these allegedly outstanding claims, and only seek payment from Horizon if these efforts were not fruitful. Despite reasonable efforts by Continuum to notify the Fund of these issues and resolve the outstanding claims, the Fund has not responded to Continuum. Continuum will now look to Horizon for payments of the claims.

5.    Horizon thus brings this action for damages and declaratory relief arising from Defendant's wrongful conduct and breach of its obligations to Horizon, and for such other and further equitable and legal relief as the Court deems just and proper.

## THE PARTIES

6.    Plaintiff Horizon Healthcare Services, Inc. ("HHS") is a non-profit health service corporation with its principal place of business in Newark, New Jersey.

7.    At all relevant times, Plaintiffs Horizon Healthcare of New York, Inc. and Rayant Insurance Company Of New York f/k/a Horizon Healthcare Insurance Company of New York were indirect, wholly-owned subsidiaries of HHS, and had their principal place of business at 1180 Avenue of the Americas, New York, New York.

8.    Defendant Local 272 Labor Management Welfare Fund is an employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), and has its principal place of business at 220 East 23rd St., New York, New York.

3

## JURISDICTION AND VENUE

9.    In accordance with Sections 301 and 302 of the New York Civil Practice Law and Rules, this Court has personal jurisdiction over Defendant because it has its principal places of business in New York County and because it transacted business within the State of New York.

10.    Venue is proper pursuant to Section 503 of the New York Civil Practice Law and Rules because Defendant has its principal places of business in New York County.

## ALLEGATIONS COMMON TO ALL COUNTS

I.    Horizon's Participation In The New York Market For Healthcare Coverage

11.    Horizon is one of the largest health insurance and managed care organizations in the New York/New Jersey area. In recognition of Horizon's market strength and the anticipated growth of its business into the New York State market in the late 1990's, many New York hospitals, including the New York Presbyterian Hospitals and Continuum, entered into individual Network Hospital Agreements ("NHAs") with Horizon.

12.    The NHAs required the Hospitals to provide healthcare services to individuals eligible for coverage under Horizon health benefit plans at negotiated rates in exchange for being permitted to join Horizon's provider network and take advantage of the anticipated increased numbers of patients the hospitals would receive as a result. In addition, Horizon agreed to include the hospitals in its published list of "Network Hospitals" and promote the use of these "Network Hospitals" to individuals enrolled in its health benefit plans.

4

13.    As a result of its efforts, Horizon was able to establish a panel of hospitals, physicians, specialists, and other healthcare providers throughout New York and New Jersey for individuals enrolled in its health benefit plans.

14.    Prior to 2001, Horizon's efforts in the New York market were focused exclusively on developing and expanding its fully insured business. Under this delivery method, an employer enters into an insurance contract with, and pays a premium to, Horizon and in return Horizon assumes the financial risk of paying claims to the hospitals or other healthcare providers for enrollees in an insured plan.

**II.    Horizon Expands Its Efforts In The New York Market And Enters Into A Contract With The Fund**

15.    In 2001, Horizon expanded its efforts in the New York market to include partially or fully administered self-insured healthcare business. Under this delivery method, an employer or health and welfare fund acts as its own insurer and uses Horizon to partially or wholly administer its group benefit plan by, among other things, providing certain administrative services to the group and allowing its employees or beneficiaries and their eligible dependents, access to Horizon's network of hospitals at rates negotiated between Horizon and the hospitals. Under this approach, the contract between the employer, group, or health/welfare fund and Horizon is not an indemnity insurance contract but a contract to pay for services rendered. In other words, the employer, group, or fund pays Horizon for its services but remains completely at risk for payment of actual claims incurred by those individuals covered under the health benefits plan.

16.    In furtherance of its efforts to expand its business in the self insured market, Horizon began marketing to self-insured union welfare benefit funds throughout the New York metropolitan area.  As a result, Horizon would provide eligible fund beneficiaries and their eligible dependents access to its Network Hospitals and perform certain administrative services, but would not assume the fund's financial responsibility for payment of claims.

17.    Horizon offered this business model to the Fund, and, in or around June 1, 2003, the Fund entered into an agreement with Horizon for administrative services (the "Agreement").  Under the terms of the Agreement, the Fund was responsible for, among other things, determining and verifying the eligibility of Fund beneficiaries and their eligible dependents, receiving, adjudicating and processing all claims for services provided by Horizon's Network Hospitals, paying claims for services rendered to its beneficiaries and their eligible dependents, and processing benefit appeals.

18.    When they entered into the Agreement, and at all times thereafter, both Horizon and the Fund understood that the Fund was not a fully-insured customer and thus assumed full responsibility for payment of claims for services rendered by health care service providers to its beneficiaries and their eligible dependents.    The parties' agreement is set forth in a written agreement and further confirmed by the course of conduct between the parties over several years.    Unlike a fully-insured customer, the Fund did not pay premiums to Horizon that would have justified Horizon agreeing to assume any liability for payment but rather paid a monthly administrative fee that was much less than a fully-insured premium.    Moreover, throughout the term of the

Agreement, the Fund processed and paid claims submitted by the hospitals and never tendered these claims to Horizon for payment.

19. The Fund further acknowledged its exclusive liability for the payment of claims by: (1) agreeing that in the event the Fund paid any hospital less than the amount to which it was entitled under the Agreement, the Fund would promptly adjust the underpayment and provide written notice to Horizon and the hospital of the adjustment; and (2) agreeing to indemnify and hold harmless Horizon against any claims related to the obligations that the Fund had assumed under the Agreement, including the obligation to pay claims submitted by Horizon's Network Hospitals.

### III. The Performance Of The Contract Between Horizon And The Fund

20. The Fund fully understood that it was obligated to pay for services performed for Fund beneficiaries and their eligible dependents. The health and welfare benefit plan identification cards issued to the Fund's beneficiaries directed that all claims were to be submitted by the hospitals directly to the Fund. The Fund would then determine whether the patient was eligible under the Fund's health and welfare benefit plan and whether the services rendered were covered under the plan. If the patient was eligible and the services were covered, the Fund would then price the claim based on Horizon's rates, remit payment for the claim directly to the hospital at the rates contracted for by Horizon, and the Fund would issue an Explanation of Benefits form directly to the Fund beneficiary.

21.    The rates at which claims were paid by the Fund under the Agreement were the rates that Horizon had negotiated with the Hospitals. These rates were typically based on a "percentage of charges" calculation, which meant that every claim received by the Fund was paid at a set, discounted percentage off of the hospital's published charges. The amount to be paid by the Fund was simply a matter of arithmetic -- discounting the charges submitted by the hospital by a certain, fixed percentage.

22.    As of June 1, 2005, claims submitted to the Fund were paid at 85% of the hospitals' published charges. Late in 2006, the percentage rose to 90% of charges. The Fund was notified of this adjustment when it was made.

## IV.    The Fund Breaches The Agreement

### A.    New York Presbyterian Hospitals

23.    For several years, the process described above was followed by the hospitals, the Fund and Horizon for the overwhelming majority of claims submitted for services rendered to Fund beneficiaries and their eligible dependents.

24.    Nonetheless, on occasion, certain of the New York Presbyterian Hospitals would submit claims directly to Horizon instead of to the Fund. In such instances, Horizon could have returned the claim to the hospital with instructions to resubmit the claim to the Fund. However, in an effort to avoid unnecessary delays in the processing or payment of claims for Fund beneficiaries and their eligible dependents, Horizon "priced" these claims for the Fund through its own processing systems and, in turn, submitted the "priced" claims to the Fund for payment.

8

25.    Unfortunately, due to a systemic administrative error, a limited number of the claims that were submitted directly to Horizon were priced at an incorrect rate, far below the amount that the Fund was obligated to pay under the Agreement.

26.    The Fund knew, or should have known, when it received these claims from Horizon that they had been mispriced, as the amount calculated by Horizon was in many instances significantly lower than the 85% or 90% of the original charges that the Fund was obligated to pay, and had been paying, on claims submitted to it by the same hospitals. Nonetheless, the Fund paid these claims at the improper rate.

27.    In February 2007, the New York Presbyterian Hospitals filed an arbitration demand against Horizon with the American Health Lawyers Association seeking to, among other things, recoup the difference between the amounts paid by the Fund and the proper amounts due and owing by the Fund under the Agreement.

28.    The New York Presbyterian Hospitals have argued that their agreements with Horizon require Horizon to either guarantee payment of claims for self-insured beneficiaries and their eligible dependents or ensure that payment is made by employers and other self-insured health and welfare funds with whom Horizon does business. The New York Presbyterian Hospitals' allegations involved claims for Fund beneficiaries and their eligible dependents as well as of a number of other union welfare benefit plans.

29.     When the New York Presbyterian Hospitals filed the arbitration, Horizon notified each of the welfare benefit funds involved regarding the discrepancy in the pricing of the limited number of mispriced claims and demanded that each fund pay the appropriate amount to the hospitals under their agreements with Horizon. The majority of funds acknowledged their obligations, and Horizon is working with these funds to resolve the issues involving any additional monies owed on these outstanding claims.

30.     Notwithstanding the foregoing, the Fund has refused to acknowledge its obligations under the Agreement and claims that it is not liable for any amounts above which they have already paid, either for those claims that Horizon mistakenly told them to pay at a greater discount than what they were contractually obligated to pay or those claims for which underpayment was alleged by the New York Presbyterian Hospitals as a result of certain administrative issues.

31.     The Fund has also refused to engage in good faith discussions with Horizon and/or the Hospitals regarding certain claims that remain unpaid or underpaid as a result of administrative determinations, such as the failure to obtain pre-certification or pre-approval for certain services.

32.     Despite repeated offers to assist the Fund to properly reconcile these claims and resolve the dispute with the New York Presbyterian Hospitals, and repeated demands for payment, the Fund refuses to abide by the Agreement and pay these claims to the New York Presbyterian Hospitals at the contracted rate.

10

33.    As a result, Horizon has been forced to incur significant costs to defend itself against the New York Presbyterian Hospitals' allegations and will be forced to satisfy any judgment that may be entered against Horizon in the arbitration for monies owed by the Fund as a result of the conduct described above.

B.    Continuum

34.    In or around November 2006, Continuum notified Horizon of certain issues arising out its agreements with Horizon. Although it never ultimately filed suit, Continuum threatened litigation against Horizon seeking to recover, among other things, amounts due and owing for services rendered by Continuum to Fund beneficiaries and their eligible dependents as well as members and eligible beneficiaries of a number of other union welfare benefit plans.

35.    As was the case with the New York Presbyterian Hospitals, Continuum has argued that Horizon is required to either guarantee payment of claims for self-insured beneficiaries and their eligible dependents or ensure that payment is made by employers and other self-insured health and welfare funds with whom Horizon does business.

36.    During the course of this dispute, the nature of Horizon's relationship with the Fund became clear to Continuum, namely that the Fund was not a fully-insured customer and was thus responsible for payment of claims for services rendered by Continuum to its beneficiaries and their eligible dependents.

11

37.    Recognizing that the Fund retained exclusively responsibility for paying claims for its beneficiaries and their dependents, Continuum agreed to first seek payment directly from the Fund for any outstanding claims.   Under this process, Continuum agreed to send to the Fund accounts receivable information setting forth all of the amounts due and demanding payment and/or justification for the Fund's failure to pay the outstanding claims.   Only if the Fund failed to respond to this demand or provide reasonable defenses to the claims would Continuum seek payment from Horizon for these claims.

38.    Pursuant to his arrangement, Continuum has notified the Fund of its outstanding obligations but has received no response.   In the absence of any response, Continuum will now seek payment for these claims from Horizon.

39.    Despite repeated offers to assist the Fund to properly reconcile these claims and resolve the dispute with Continuum, and repeated demands for payment, the Fund refuses to abide by the Agreement, respond to Continuum's claims request,  and pay these claims to Continuum at the contracted rate.

40.    As a result, Horizon has been forced to incur significant costs to defend itself against Continuum's allegations and will be forced to satisfy any claims that may be made against Horizon for monies owed by the Fund as a result of the conduct described above.

12

## COUNT ONE
### (Breach of Contract)

41.    Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

42.    The Fund was required under the Agreement to make payments to the Hospitals at the rates negotiated by Horizon with the Hospitals.

43.    The Fund has breached its obligations under the Agreement by paying less than they were required to pay for certain claims submitted by the Hospitals for services rendered by the Hospitals to the Fund's beneficiaries and their eligible dependents.

44.    Horizon has made demand upon the Fund for payment of these sums, but the Fund refuses to pay.

45.    Horizon has adequately and timely performed all of its obligations under the Agreement.

46.    As a direct and proximate result of the Fund's wrongful conduct, Horizon has suffered, and will continue to suffer, damages in an amount to be proved at trial

## COUNT TWO
### (Breach of Duty of Good Faith and Fair Dealing)

47.    Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

48.    Implied in every contract performed in New York is a covenant of good faith and fair dealing which requires the parties to a contract to deal fairly and in good faith with one another.  The Agreement is a contract performed in New York and is therefore subject to this implied duty of good faith and fair dealing.

13

49.    By engaging in the acts and omissions described above, especially with respect to its failure to pay the contracted amounts for services rendered to its beneficiaries and their eligible dependents by the Hospitals, the Fund has breached, and continues to breach, the implied duty of good faith and fair dealing in the Agreement.

50.    As a direct and proximate result of the Fund's failure to deal in good faith, Horizon has suffered, and will continue to suffer, damages in an amount to be proved at trial.

**COUNT THREE**
**(Unjust Enrichment)**

51.    Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

52.    The Fund intentionally paid less than it was required to pay for certain claims submitted by the Hospitals, as it knew or should have known that the amount at which it paid these claims was significantly lower than the rate at which it agreed to pay them.

53.    It would be unjust and inequitable to allow the Fund to retain the monies it wrongfully retained by failing to abide by its contractual obligations and to ensure that full payment was remitted to the Hospitals for services rendered to the Fund's beneficiaries and their eligible dependents.

54.    As a direct and proximate result of the Fund's wrongful acquisition and retention of these monies, Horizon has suffered, and will continue to suffer, damages in an amount to be proved at trial.

## COUNT FOUR
### (Prima Facie Tort)

55.    Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

56.    The Fund intended to cause Horizon harm by failing to pay the appropriate rates for services rendered by the Hospitals to the Fund's beneficiaries and their eligible dependents, and succeeded in doing so.

57.    The Fund paid less than it was required to pay for certain claims submitted by the Hospitals, when it knew or should have known that the amount at which it paid these claims was significantly lower than the rate at which it agreed to pay them.

58.    The Fund intended that this conduct would cause harm to Horizon and/or knew with certainty that its conduct would cause harm to Horizon.

59.    The conduct described above was not justifiable under any circumstances.

60.    As a direct and proximate result of the Fund's conduct, Horizon has suffered, and will continue to suffer, damages in an amount to be proved at trial.

## COUNT FIVE
### (Declaratory Judgment)

61.    Horizon repeats and realleges the prior allegations of this Complaint as if set forth completely herein.

62.    This is a cause of action for declaratory relief pursuant to CPLR 3001 and 3007. Horizon seeks a judicial determination of the parties' rights under the Agreement. The issuance of the requested declaration will resolve the controversy between the parties over the correct interpretation and application of the Agreement

15

63.   The Fund has wrongfully failed and refused to remit payment to the Hospitals in the amounts previously agreed to by the parties, in violation of the Fund's obligations under the Agreement, and refused to defend and indemnify Horizon against the claims made against Horizon by the New York Presbyterian Hospitals in the Arbitration.

64.   An actual and justiciable controversy presently exists regarding the Fund's obligations under the Agreement, including without limitation its indemnity obligations.

65.   Horizon does not have an adequate remedy at law, and will continue to be harmed and damaged unless this Court enters appropriate temporary, preliminary and final injunctive relief.

**WHEREFORE**, Horizon demands judgment against the Fund as follows:

1.   That the Fund be ordered to pay the differential between what was paid to the Hospitals for services rendered by the Hospitals to Fund beneficiaries and their eligible dependents and what should have been paid under the Agreement.

2.   That the Fund be ordered to pay any damages that the New York Presbyterian Hospitals may be awarded in the arbitration in connection with the claim that Horizon is liable for the difference between what the Fund paid for services rendered to the Fund's beneficiaries and their eligible dependents by the Hospitals and the contracted rates between Horizon and the Hospitals.

3.   That the Fund be ordered to reimburse any damages or other amounts that Horizon pays the Hospitals for the difference between what the Fund paid for services rendered to the Fund's beneficiaries and their eligible dependents and the contracted rates between Horizon and the Hospitals.

16

4.   That the Fund be ordered to pay Horizon's reasonable attorneys' fees and the costs and disbursements in connection with its defense of the arbitration brought by the New York Presbyterian Hospitals in connection with the conduct described above.

5.   That compensatory, consequential and punitive damages be awarded in favor of Horizon and against the Fund, together with interest thereon.

6.   That Horizon be granted such other relief against the Fund as this Court deems just and proper.

Dated: New York, New York
       April 22, 2008

GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

By _____
   David Jay

17

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HORIZON HEALTHCARE SERVICES, INC.,
HORIZON HEALTHCARE OF NEW YORK,
INC. and RAYANT INSURANCE COMPANY OF
NEW YORK f/k/a HORIZON HEALTHCARE
INSURANCE COMPANY OF NEW YORK,

        Plaintiffs,

        - against -

LOCAL 272 LABOR MANAGEMENT
WELFARE FUND,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 601213/08

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK    )
                             ) s.s.
COUNTY OF NEW YORK   )

        MICHELLE WILLIAMS, being duly sworn, deposes and says:

        That deponent is not a party to this action, is over eighteen years of age and resides in North Brunswick, New Jersey.

        That on the **12th day of May, 2008** deponent served by first class mail the **NOTICE OF REMOVAL** thereof upon:

        **GREENBERG TRAURIG, LLP**
        *Attorneys for Plaintiffs*
        **200 Park Avenue**
        **New York, New York 10166**

                                                Michelle Williams

Sworn to before me this
12th day of May 2008

        Notary Public

Jane L. Barker
Notary Public, State of New York
No. 02BA6144861
Qualified in Westchester County
Commission Expires May 1, 20_10_

{00325097.DOC;}

**Exhibit C**
# (part 1 of 10)

# LOCAL 272

# WELFARE FUND

# SUMMARY PLAN DESCRIPTION



# WEB ADDRESS: WWW.272WELFARE.COM

## ESTE FOLLETO ESTÁ EN ESPAÑOL EN EL WEB SITE

D 0010

# Local 272 Welfare Fund

220 East 23rd Street, Room 805

New York, NY 10010

Phone: 212-726-9730

Fax: 212-726-9737

Web Address: www.272welfare.com

## BOARD OF TRUSTEES

**Union Trustees**

Eddie Allers
Secretary Treasurer/
Business Manager
Local 272
220 East 23rd Street, Room 801
New York, NY 10010

Fred Alston
President
Local 272
220 East 23rd Street, Room 801
New York, NY 10010

Joseph Mattesi
Vice President
Local 272
220 East 23rd Street, Room 801
New York, NY 10010

Matthew Bruccoleri
Trustee, Alternate
Local 272
220 East 23rd Street, Room 801
New York, NY 10010

**Employer Trustees**

Gordon Hamm
Garage Management Corporation
124 East 63rd Street
New York, NY 10021

Lance Howard
Little Man Parking
292 5th Avenue
New York, NY 10001

Kenneth Rosenblatt
Champion Parking
545 Madison Avenue
New York, NY 10021

D 0011

**FUND MANAGER**

Marc A. Goodman

**FUND CO-COUNSEL**

Bruce Cooper, Esq.

Robert Schanzer, Esq.

**FUND CONSULTANTS**

The Segal Company

2

D 0012

April 1, 2006

Dear Participant:

We are pleased to provide this updated summary of the benefits provided by the Local 272 Welfare Fund (called the "Fund" or "Plan" in this booklet).

The Fund's benefits include:

□ Hospital and medical coverage

□ Prescription drug benefits

□ Dental coverage

□ Vision benefits

□ Death and accidental death & dismemberment benefits.


You should use this booklet to find out:

□ Who is eligible for coverage

□ The types of benefits that are provided and any limitations on those benefits

D 0013

❑ How to claim benefits

❑ Who to contact for more information.

This coverage is financed through employer contributions as a result of collective bargaining agreements between the Union and your employer. No premiums or contributions are required of you.

This booklet describes your benefits in easy-to-understand terms. While every effort has been made to ensure that the information here is accurate, the Plan is governed by official Plan documents. If there is any conflict between the information presented in this booklet and the official Plan documents, the official Plan documents will govern.

We urge you to read this booklet carefully and keep it handy for future reference. Please call the Fund Office at 212-726-9730 if you have any questions.

Sincerely,


The Board of Trustees

D 0014

Benefits under this Plan are for the sole use of you and your eligible dependents. No one (including an employer, Union representative, supervisor or shop steward) other than the Board of Trustees has any authority to interpret this SPD or other Plan documents or to make any promises to you about them.

Este folleto contiene un resumen en Ingles de sus derechos y beneficios bajo el Plan de Bienester de la Local 272. Si tiene dificultad para entender alguna parte de este folleto, comuniquese con el Local 272 Welfare Fund, al 220 East 23rd Street, Room 805, New York, NY 10010 o llame al numero 212-726-9730. Horas de oficina 9:00 A.M. - 5:00 P.M. de Lunes a Viernes.

D 0015

# TABLE OF CONTENTS

YOUR BENEFITS AT A GLANCE ............................................................ 1

ELIGIBILITY AND PARTICIPATION ...................................................... 5
  Eligibility ............................................................................................. 5
  When Coverage Starts ........................................................................ 5
  Dependent Coverage ........................................................................... 8
  "Eligible Dependents" ......................................................................... 8
  Changing Coverage ............................................................................. 11
  When Coverage Ends .......................................................................... 11
  Continuation of Health Care Coverage Under "COBRA" ................. 15
  COBRA Coverage ................................................................................ 15
  Your Rights Under the Health Insurance Portability and
  Accountability Act of 1996 (HIPAA) ................................................ 27

MEDICAL BENEFITS ........................................................................... 31
  Horizon and Alicare – The Plan's Partners ....................................... 31
  More About Horizon and In-Network and Out-of-Network
  Services ............................................................................................... 32
  Copay or Coinsurance? ...................................................................... 32
  Finding a Network Provider ............................................................... 37
  Maximum Lifetime Benefit ................................................................ 37
  Alicare Medical Management ............................................................. 39
  Covered Medical Expenses ................................................................. 40
  Other Covered Expenses ..................................................................... 42
  Medical Expenses That Are Not Covered .......................................... 51
  Utilization Management – Plan Features Designed to Help
  Keep Costs Down ............................................................................... 57

PRESCRIPTION DRUG BENEFIT ......................................................... 65
  How It Works ..................................................................................... 65
  Summary of Pharmacy Benefits ......................................................... 66
  What Is Covered and What Is Not Covered ....................................... 69

DENTAL BENEFIT ............................................................................... 73
  Predetermination Requirement .......................................................... 74
  Covered Dental Services ..................................................................... 74

VISION CARE BENEFIT ...................................................................... 84

D 0016

How it Works                                                              84
  Additional Vision Benefits                                              85


**DEATH AND ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS**                  86
  Death Benefits                                                          86
  Dismemberment Benefits                                                  88
  Exclusions                                                              89


**COORDINATION OF BENEFITS**                                              90
  Which Plan Pays First                                                   90


**CLAIM REVIEW AND APPEAL PROCEDURES**                                    93
  How to File a Claim                                                     93
  When Claims Must Be Filed                                               95
  Where To File Claims                                                    96
  Authorized Representatives                                              97
  Medical Benefits                                                        98
  Pre-Service and Urgent Care Claims                                      98
  Concurrent Claims                                                      102
  Post-Service Claim                                                     103
  Disability Claims                                                      105
  Notice of Decision                                                     106
  Request for Review of Denied Claim                                     108
  Review Process                                                         110
  Notice of Decision on Review                                           112
  Limitation on When a Lawsuit may be Started                            113


**THIRD PARTY LIABILITY**                                                115
  Advance on Account of Plan Benefits                                    115
  Subrogation Agreement                                                  116
  Cooperation with the Plan by All Covered Individuals                   117
  Remedies Available to the Plan                                         119


**IMPORTANT INFORMATION ABOUT THE WELFARE FUND**                         119


**YOUR RIGHTS UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY
  ACT OF 1974 (ERISA)**                                                  126
  Receive Information About Your Plan and Benefits                       126
  Continue Group Health Plan Coverage                                    127
  Prudent Actions by Plan Fiduciaries                                    127
  Enforce Your Rights                                                    128

D 0017

Assistance With Your Questions    129

**ADMINISTRATION AND CONTACT INFORMATION**    131

D 0018

# YOUR BENEFITS AT A GLANCE

YOUR BENEFITS AT A GLANCE
Effective February 1, 2005
FOR PARTICIPANTS AND COVERED DEPENDENTS

## Hospital and Medical Benefits

Benefits are available both on an <u>in-network</u> basis through the Horizon Healthcare network and on an <u>out-of-network</u> basis through a provider you choose:

☐ When services are provided by a member of the Horizon network, you pay either a $15 or $25 copay, or in some cases 10% coinsurance, and the Plan pays the balance.

☐ When services are provided out-of-network, the Plan pays the same amount it would have paid a member of Horizon's network, and you are responsible for any amount the provider charges that is more than what Horizon would pay.

1

D 0019

### Prescription Drug Benefits

**Provided through National Medical Health Card Systems, Inc. ("NMHC"):**

**If you go "in network" to a participating pharmacy,** here is what you pay for a 30-day supply:

☐ a $15 copay for a generic or "preferred" brand name drug, or

☐ a $30 copay for a brand-name drug that is not on the Plan's preferred list.

**If you go to an "out of network" retail pharmacy,** you have to pay the pharmacy's regular charge up front and submit a claim for reimbursement. You are responsible for the copay plus any difference between the amount the Plan would have reimbursed a participating pharmacy for that medication and the amount actually charged by your pharmacy.

**If you use the mail-order service,** here is what you pay for a 90-day supply:

• a $30 copay for a generic or preferred brand name drug, or

• a $60 copay for a brand-name drug that is not on the Plan's preferred list.

D 0020

2

## Dental Benefits

**Provided through DDS, Inc. ("DDS"):**

Before the Plan pays any benefits, you are responsible for a $100 per person ($250 per family) annual deductible that applies to all covered services.

The Plan covers a maximum annual benefit of up to $1,000 per covered person, according to a schedule that provides a fixed allowance (called the "allowed amount") per procedure.

If you go to a participating dentist, you are only responsible for the applicable copay listed in the dental schedule of benefits. If you go to a dentist outside of the DDS network, you must pay the entire cost up front and file a claim with DDS for reimbursement. You will be reimbursed up to the applicable allowed amount, less the copay. If your dentist charges more than the allowed amount, you will also be responsible for that additional amount.

## Vision Services

**Available at Vision Screening and General Vision Services ("GVS") optical centers:**

If you go to a Vision Screening or GVS participating optical center, you are entitled to an eye examination and a new pair of glasses from an approved group of products once every 24 months. Glasses, lenses and lens treatments outside of the covered selection are available at a discount.

Your covered dependents under age 16 are eligible for an eye exam and pair of glasses once every 12 months.

3

D 0021

## BENFITS FOR PARTICIPANTS ONLY

### Death and Accidental Death & Dismemberment Benefits

**Provided by the Fund:**

- $7,500 is paid to your beneficiary if you die while covered by the Fund.

- An additional $7,500 is paid to your beneficiary if you die as the result of an accident. Also, all or a portion of this $7,500 accidental death benefit may be paid to you if you lose one or more limbs, or your eyesight, as the result of an accident.

4

D 0022

## ELIGIBILITY AND PARTICIPATION

### Eligibility

The benefits under this Plan are available only to individuals who work in "covered employment."

> "Covered employment" means work covered by a collective bargaining agreement or another agreement (such as a participation agreement for Fund employees) that requires your employer to make contributions to the Local 272 Welfare Fund on your behalf.

Coverage is also available for your "eligible dependents," as defined later in this section.

### When Coverage Starts

Coverage starts once you meet the Plan's eligibility requirements.

You qualify for coverage once you work 360 hours in Covered Employment in a period of three consecutive months. Coverage takes effect on the first day of the second month after you complete the 3-month requirement and continues for the entire

D 0023

month,    provided    your    employer    makes    the    obligatory
contributions. The following table shows how this works:

| 360 Hours of Contributions Made on Your Behalf During the Applicable Three Month Period... | Provides Coverage for the Following Months: |
|---|---|
| January–March | May |
| February–April | June |
| March–May | July |
| April–June | August |
| May–July | September |
| June–August | October |
| July–September | November |
| August–October | December |
| September–November | January |
| October–December | February |
| November–January | March |
| December–February | April |

For example, if you begin to work in Covered Employment in July 2003 and you complete 360 hours in your initial three-month period, ending in September 2003, your initial coverage will be for the month of November 2003.

To be eligible for benefits, your employer must make the required contributions on your behalf.

D 0024

**Your collective bargaining agreement may have a different rule.** Certain collective bargaining agreements have eligibility rules that may vary from the general rule described above. For example, some employers start making contributions after the first six months, with participation taking effect after seven months. To verify the eligibility rules that apply to you, contact the Fund Office.

> If you need to access your eligibility information, call the Fund Office at (212) 726-9730 and use the automated system.

**Continuing coverage.** Coverage continues uninterrupted beyond your initial eligibility period as long as you have 360 hours in Covered Employment in each successive three consecutive month period and your employer continues making contributions on your behalf. You may have an interruption in coverage if these requirements are not met. The Fund Office will notify you if you do not qualify for continued coverage, and will send you a notice describing your right to pay for continuation coverage under the federal law known as "COBRA."

**Disability extension.** If you are unable to work because of disability, and are collecting Statutory State Disability

D 0025

Insurance, your coverage automatically continues for up to six months.

**Dependent Coverage**

Eligibility for coverage for your dependents generally begins on the same date that your coverage starts or, if later, when they first become your dependent. However, coverage will not begin if you do not provide necessary proof of dependent status.

> **For dependent coverage to take effect as soon as possible, please provide all information requested by the Fund Office and please carefully review the materials you receive from the Fund Office — they will tell you what information, if any, is required. If you do not promptly send the information, your dependent's coverage will be delayed.**

**"Eligible Dependents"**

Your eligible dependents include:

❑ The spouse to whom you are legally married.

❑ Unmarried dependent children until the end of the calendar year in which they reach age 19.

❑ Unmarried dependent children who are full-time students in an accredited educational institution until the earliest of:

D 0026

- The date they reach age 23,

- The end of the semester in which their full-time student status ends.

☐ Unmarried children over age 19 who are incapable of self-sustaining employment because of physical handicap or mental handicap. The incapacity must have started before the child reached age 19, must be certified by a doctor, and may have to be recertified periodically. Initial written proof of the child's disability must be submitted to the Fund Office within 31 days after the child's 19th birthday.

**Dependent children** include your natural children, adopted children (including a child placed in your home for whom you have begun adoption procedures), children living with you for whom you are financially responsible and are appointed legal guardian by a court, and children required to be recognized under a Qualified Medical Child Support Order ("QMCSO"). A foster child is not included.

**About QMCSOs.** A Qualified Medical Child Support Order, or QMCSO, is an order issued by a court or state administrative agency that requires that medical coverage be provided under a plan for a

D 0027

child or children. A QMCSO usually results from a divorce, legal separation or paternity proceeding.

The Fund Office will notify you if a QMCSO is received with regard to your coverage. If you, your child, or the child's custodial parent or legal guardian would like a copy of the Plan's written procedures for handling QMCSOs, or if you have any questions about this process, please contact the Fund Office.

---

When you enroll a dependent you will be asked to provide proof of dependent status -- for example, a birth certificate, a marriage certificate, or other proof of dependent status.

For eligible dependents to be covered, they must be claimed on your tax return, and you must be legally responsible for them. Your name has to be on their birth certificate and/or court papers.

For covered dependents who are students, the Plan requires proof of full-time status once every six months.

---

When you acquire a new dependent (for example, you get married or have a baby) you must provide all necessary documentation within 30 days after your marriage or the birth or adoption of your child. In the case of a newborn child, coverage automatically starts as of the date of birth, but continues beyond 30 days only if you submit the required documentation. (Note that children born to covered dependent children are not covered under the Plan.)

D 0028

**Keep personal information up to date.**

> You must notify the Fund Office promptly if:
>
> ❏ you marry
>
> ❏ a child is born
>
> ❏ you change your address or phone number
>
> ❏ you get divorced
>
> ❏ someone in your family dies
>
> ❏ a child reaches age 19, marries or ends his or her education
>
> ❏ you want to change your beneficiary.

**Changing Coverage**

You may start coverage for an eligible dependent at any time. The change generally takes effect as of the first day of the month following the month the Fund Office receives the applicable birth or marriage certificate. In the case of a newborn child, coverage automatically starts as of the date of birth, but continues beyond the first 30 days only if you submit the required birth certificate.

**When Coverage Ends**

**For you.** Your coverage ends if:

D 0029

- ❑ You fail to complete the service requirement (360 hours in three consecutive months) and you do not qualify for the disability waiver,

- ❑ Your employer does not make the required contributions on your behalf, or

- ❑ The Plan terminates.

**For your dependents.** Coverage for your dependents ends if:

- ❑ Your coverage ends,

- ❑ They no longer meet the definition of "dependent," or

- ❑ The Plan terminates.

**Family and medical leave.** If your employer has 50 or more employees, you may be eligible for leave under the Family and Medical Leave Act (FMLA). Under FMLA you may take up to 12 weeks of unpaid leave for specified family or medical purposes, such as your own serious medical condition, the birth or adoption of a child, or to provide care for a spouse, child or parent who is ill. You are generally eligible if you have worked for the employer for at least 1,250 hours in the preceding 12 months and

D 0030

**Exhibit C**
# (part 2 of 10)

are employed at a work site where there are at least 50 employees.

If you take an FMLA leave, your employer is obligated to continue to contribute to the Fund on your behalf and your coverage through the Fund will continue.

If you do not return to employment following an FMLA leave during which coverage was provided, you may be required to provide reimbursement to your employer for the cost of coverage received during the leave.

Call your employer if you have questions regarding your eligibility for an FMLA leave. Call the Fund Office if you have questions regarding Fund coverage during such a leave.

If you do not return to work after the end of your FMLA leave, you may be eligible to continue coverage under the Consolidated Omnibus Budget Reconciliation Act, commonly called COBRA, described below.

**Military leave.** If you are on active military duty for 31 days or less, you will continue to receive health care coverage in accordance with the Uniformed Services Employment and

13

Reemployment Rights Act of 1994 (USERRA). If you are on active duty for more than 31 days, your coverage ends, but USERRA permits you to continue health care coverage for you and your dependents at your own expense for up to 18 months. This continuation right operates in the same way as COBRA coverage, which is described later in this booklet. In addition, your dependent(s) may be eligible for health care coverage under the federal program known as TRICARE (which includes the old "CHAMPUS" program). This Plan coordinates its coverage with TRICARE.

If you receive an honorable discharge and return to work with a contributing employer, your full eligibility will be reinstated on the day you return to work as long as you return within one of the following time frames:

❑ 90 days of the date of discharge, if the period of service is more than 180 days;

❑ 14 days from the date of discharge, if the period of service was 31 days or more but less than 180 days; or

❑ one day after discharge (allowing 8 hours for travel) if the period of service was less than 31 days.

D 0032

If you are hospitalized or convalescing from an injury caused by active duty, these time limits may be extended up to two years.

Under USERRA an active employee is required to notify the employer (in writing or orally) that he or she is leaving for military service unless circumstances or military necessity make notification impossible or unreasonable. Your employer is required to notify the Plan within 30 days after you are reemployed following military service; however, it is a good idea for you to notify the Fund Office, too.

> Contact your employer if you have questions regarding your eligibility for a leave. Contact the Fund Office if you have any questions regarding Fund coverage during such a leave.

## Continuation of Health Care Coverage Under "COBRA"

### COBRA Coverage

The Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), requires that this Plan offer you and your eligible dependents the opportunity for a temporary extension of health care coverage at group rates in certain instances when coverage under the Plan would otherwise end (called "qualifying events"). Continued coverage under COBRA applies to the health

D 0033

care benefits described in this booklet (life insurance and AD&D benefits are not included in COBRA coverage).

The benefits under COBRA are the same as those covering people who are not on continuation coverage. You should also keep in mind that each individual entitled to coverage as the result of a qualifying event has a right to make his or her own election of coverage. For example, your spouse or other covered dependent may elect COBRA coverage even if you do not. In addition, one qualified beneficiary can elect COBRA for others (for example, a parent or legal guardian may elect continuation coverage for a minor child).

**Qualifying COBRA Events.** The chart below shows when you and your eligible dependents may qualify for continued coverage under COBRA, when coverage may start and when it ends.

D 0034

| If You Lose Coverage Because of This Reason (a "qualifying event") | These People Would Be Eligible | For COBRA Coverage Up To (measured from the date coverage is lost) |
|---|---|---|
| Your employment terminates[*] | You and your covered spouse and children | 18 months[**] |
| Your working hours are reduced | You and your covered spouse and children | 18 months[**] |
| You die | Your covered spouse and children | 36 months |
| You divorce or legally separate | Your covered spouse and children | 36 months |
| Your dependent child no longer qualifies as an eligible dependent | Your covered children | 36 months |
| You become entitled to Medicare | Your covered spouse and children | 36 months |

[*]For any reason other than gross misconduct (and including military leave and approved leaves granted according to the Family and Medical Leave Act.)

[**]Continued coverage for up to 29 months from the date of the initial event may be available to those who are totally disabled within the meaning of Title II or Title XVI of the Social Security Act at the time coverage is lost or become totally disabled within 60 days after that. This additional 11 months is available to employees and enrolled dependents if notice of disability is provided within 60 days after the Social Security determination of disability is issued and before the 18-month continuation period runs out.  The cost of the additional 11 months of coverage will increase to 150% of the full cost of coverage.

D 0035

**Newborn Children.** If you have a newborn child, adopt a child, or have a child placed with you for adoption while continuation coverage under COBRA is in effect, you may add the child to your coverage (but you may not add your spouse to your coverage). To add coverage for the child, notify the Fund Office within 30 days of the child's birth, adoption or placement for adoption. Legal proof of your relationship to the child must also be provided. You may not add a new spouse to your coverage.

**Multiple Qualifying Events.** If your covered dependents experience more than one qualifying event while COBRA coverage is in force, they may be eligible for an additional period of continued coverage, *but your total period of COBRA coverage will not exceed a total of 36 months from the date of the first qualifying event.*

> **For example,** if your employment ends, you and your covered dependents may be eligible for 18 months of continued coverage. During this 18-month period, if you die (a second qualifying event), your covered dependents may be eligible for an additional period of continuation coverage. However, the two periods of coverage combined may not exceed a total of 36 months from the date of the first qualifying event (your termination).

D 0036

18

**When your employer must notify the Fund Office.** Your employer must notify the Fund Office of your death, termination of employment, reduction in hours of employment or Medicare entitlement no later than 60 days after your loss of coverage due to one of these events. **However, you or your family should also notify the Fund Office if such an event occurs, in order to avoid confusion as to your status.**

**When you or your beneficiary must notify the Fund Office.** As a covered participant or qualified beneficiary, you are responsible for providing the Fund Office with timely notice of certain qualifying events. These events include:

❑ Divorce or legal separation.

❑ A child no longer satisfies the eligibility requirements for coverage.

❑ A second qualifying event occurs after a qualified beneficiary has become entitled to COBRA with a maximum of 18 (or 29) months. This second qualifying event could include an employee's death, entitlement to Medicare, divorce or legal separation, or a child losing dependent status.

D 0037

☐ When a qualified beneficiary entitled to receive COBRA coverage for a maximum of 18 months has been determined by the Social Security Administration to be disabled (as long as the disability occurred on or before the start of COBRA coverage or within the first 60 days of COBRA coverage). The qualified beneficiary may be eligible for an 11-month extension of the otherwise applicable 18-month period of coverage, for a total of 29 months of COBRA coverage.

☐ When the Social Security Administration determines that a qualified beneficiary is no longer disabled.

You must make sure that the Fund Office is notified of any of the events listed above. Failure to provide this notice in the form and within the timeframes described below will prevent you and/or your dependents from obtaining or extending COBRA coverage.

How to provide notice. Your notice should be sent to:

> Fund Manager
> Local 272 Welfare Fund
> 220 East 23rd Street, Room 805
> New York, NY 10010

Please include the following in your notice:

☐ your name,

D 0038

20

- the names of your dependents,

- your Social Security number and the Social Security numbers of your dependents,

- your address, and

- the nature and date of the occurrence you are reporting to the Fund.

**When the notice must be sent.** If you are providing notice due to a divorce or legal separation, a dependent losing eligibility for coverage, or a second qualifying event, you must send the notice no later than 60 days after the later of (1) the date of the relevant qualifying event; or (2) the date on which coverage would be lost as a result of the qualifying event.

*If you are providing notice of a Social Security Administration determination of disability*, notice should be sent no later than 60 days after the later of (1) the date of the disability determination by the Social Security Administration; (2) the date of the qualifying event; or (3) the date on which the qualified beneficiary would lost coverage due to the qualifying event.

D 0039

*If you are providing notice of a Social Security Administration determination that you are **no longer** disabled,* notice must be sent no later than 30 days after the date of the determination by the Social Security Administration that you are no longer disabled.

The time periods to provide these notices will not begin until you have been informed of the responsibility to provide the notice and these notice procedures through the furnishing of a summary plan description or a general (initial) notice by the plan.

**Who can provide notice.** Notice may be provided by the covered employee, qualified beneficiary with respect to the qualifying event, or any representative acting on behalf of the covered employee or qualified beneficiary. Notice from one individual will satisfy the notice requirement for all related qualified beneficiaries affected by the same qualifying event. For example, if an employee, her spouse and her child are all covered by the plan, and the child ceases to be a dependent under the plan, a single notice by the spouse would satisfy this requirement.

D 0040

**Keep the Fund informed of Address Changes**

In order to protect your family's rights, you should keep the Fund Office informed of any changes in the addresses of family members. You should also keep a copy for your records of any notices you send to the Fund Office.

**Electing COBRA coverage.** The Fund must notify you and/or your covered dependents of your right to COBRA coverage within 14 days after it receives timely notice or becomes aware that a qualifying event has occurred. **You will have 60 days to respond if you want to continue coverage – measured from the date coverage would otherwise end or, if later, the date the COBRA notice is sent to you.**

When you or your dependents have provided notice to the Fund of a divorce or legal separation, a beneficiary ceasing to be covered under the Plan as a dependent, or a second qualifying event, but you are not in fact entitled to COBRA, the Fund will send you a written notice stating the reason why you are not eligible for COBRA. This will be provided within the same timeframe that the Fund is required to provide an election notice.

**Paying for COBRA coverage.** You have to pay the full cost of continued coverage under COBRA, plus a 2% administrative fee. If you are eligible for 29 months of continued coverage due to disability, the law permits the Fund to charge 150% of the full

23

cost of the plan during the 19th to 29th months of coverage. Your first payment must be made within 45 days after you elect to continue coverage. All subsequent payments will be due on the first day of each month for that month's coverage. You will be notified by the Fund Office if the amount of your monthly payment changes.

COBRA premiums are generally reviewed at least once a year and are subject to change. You will be notified by the Fund Office if the amount of your COBRA payment changes. In addition, if the benefits change for active employees, your coverage will change as well.

**When COBRA coverage ends.** Your continued coverage under COBRA will end if:

☐ Coverage has continued for the maximum 18, 29 or 36 month period.

☐ The Plan terminates. If the coverage is replaced, you may be continued under the new coverage.

☐ You or your dependent(s) fail to make the necessary payments on time.

24

D 0042

□ You or a covered dependent(s) become covered under another group health plan that does not exclude coverage for pre-existing conditions or the pre-existing conditions exclusion does not apply.

□ You or a covered dependent becomes entitled to benefits under Medicare.

□ You or your dependent(s) are continuing coverage during the 19th to 29th months of a disability, and the disability ends.

Continuation coverage may also be terminated for any reason the Plan would terminate coverage of a participant or beneficiary not receiving continuation coverage (such as fraud).

Full details of COBRA continuation coverage will be furnished to you or your eligible dependents when the Fund Office receives notice that a qualifying event has occurred. It is important to contact the Fund Office as soon as possible after one of these events occurs.

If continuation coverage is terminated before the end of the maximum coverage period, the Fund will send you a written notice as soon as practicable following the determination that

D 0043

continuation coverage will be terminated early. That notice will tell you the date of termination, and your rights, if any, to alternative individual or group coverage.

**Consequences of failing to elect COBRA.** In considering whether to elect continuation coverage, you should take into account the effect your decision will have on your future rights under federal law.

*First,* you can lose the right to avoid having pre-existing condition exclusions applied to you by other group health plans if you have more than a 63-day gap in health coverage, and election of continuation coverage under COBRA may help you avoid such a gap.

*Second,* you will lose the guaranteed right to purchase individual health insurance policies that do not impose such pre-existing condition exclusions if you do not get continuation coverage for the maximum time available to you.

*Finally,* you should take into account that you have special enrollment rights under federal law. You should have the right to request special enrollment in another group health plan for which you are otherwise eligible (such as a plan sponsored by

D 0044

Exhibit C
# (part 3 of 10)

your spouse's employer) within 30 days after your group healt

coverage ends because of the qualifying events listed above. You

will also have the same special enrollment right at the end of

the continuation coverage if you get continuation for the maximum

time available to you.


**Your Rights Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA)**

Under the federal law called the Health Insurance Portability and

Accountability Act of 1996 (commonly called "HIPAA") the Fund is

required to provide the following rights.


**Special enrollment rights.** HIPAA requires that plans like ours

guarantee that participants and dependents not otherwise enrolled

in a plan have special enrollment rights if certain events occur,

known as "qualifying circumstances" under HIPAA. Qualifying

circumstances include:


☐ A change in family status, such as marriage, divorce, birth,

adoption, placement for adoption, or death. Under these

circumstances coverage takes effect immediately as long as

coverage is requested within 30 days of the applicable event.


☐ You previously stated in writing that you and or your

dependents were waiving Fund coverage because of coverage

D 0045

under another medical plan, and that other coverage is lost for any of the following reasons:

- termination of employment;

- reduction in hours worked;

- your spouse dies;

- you and your spouse divorce or legally separate;

- the other coverage was COBRA continuation coverage, and you or your dependent reaches the maximum length of time for COBRA continuation coverage; or

- the other plan terminates because the employer or other sponsor did not pay the premium when due.

More information about these rights is available from the Fund Office.

**Certificate of Creditable Coverage.** When your Fund coverage ends, you and/or your dependents will be provided with a "Certificate of Creditable Coverage." Certificates of Creditable Coverage indicate the period of time you and/or your dependents were covered under the Fund (including COBRA coverage), as well as certain additional information required by law. The Certificate of Creditable Coverage may be necessary if you and/or your dependents become eligible for coverage under another group

D 0046

health plan, or if you are covered under a health insurance policy, within 63 days after your coverage under this Fund ends (including COBRA coverage). The Certificate of Creditable Coverage is necessary because it may reduce any exclusion for pre-existing coverage periods that may apply to you and/or your dependents under the new group health plan or health insurance policy.

The Certificate of Creditable Coverage will be provided to you:

- on your request, within 24 months after your Fund coverage ends

- when you are entitled to elect COBRA

- when your coverage terminates, even if you are not entitled to COBRA

- when your COBRA coverage ends.

You should retain these Certificates of Creditable Coverage as proof of prior coverage for your new health plan. For further information, call the Fund Office.

29

D 0047

**Other HIPAA rules.** This Plan is a covered entity under HIPAA's privacy regulations. For a copy of the Fund's "Notice of Privacy Practices," please contact the Fund Office.

D 0048

## MEDICAL BENEFITS

The Plan provides a comprehensive package of hospital and health care benefits – ranging from office visits, to lab tests and x-rays, to major surgery and hospital care.

At the end of this section is a chart that shows the principal types of benefits provided by the Plan. Later sections describe your medical benefits in more detail.

### Horizon and Alicare – The Plan's Partners

The Fund has two partners in providing medical benefits for you and your family – Horizon Healthcare and Alicare Medical Management.

□ Horizon provides the network of health care providers through which "in network" services are provided under our plan.

□ Alicare provides administrative services to the Fund, including pre-admission review and certification, pre-surgery (one day admission) review and certification, pre-MRI and CT ("catscan") review and certification and Medical Management services.

D 0049

31

**More About Horizon and In-Network and Out-of-Network Services**

The Plan provides benefits for both in-network and out-of-network services. **Using a network doctor may save you money.**

**In-network services** are services provided by a doctor, hospital or other health care provider that has been selected by Horizon to provide care for members. Some of the key features of in-network services include:

❑ The ability to choose from an extensive network of providers;

❑ A small copayment or coinsurance for all services covered by the Plan;

❑ There are no claim forms to file.

**Copay or Coinsurance?**

Some network services require a <u>copay</u>. That is a fixed amount (usually $15 or $25) that you pay when you receive the service.

Other network services require <u>coinsurance</u>. That means you pay a percentage (usually 10%) of the amount covered by the Plan (if the Plan covers $100 then you pay $10 and the Plan pays $90).

D 0050

This chart shows you the type of payment required for different services.

| Service | Copay or Coinsurance |
|---|---|
| Doctor visits in the office or at home | $15 copay |
| Well-Child Care (routine checkups and immunizations) | $15 copay |
| Physical Therapy (maximum 30 visits/year) | $25 copay |
| Chiropractor (maximum 10 visits/year) | $25 copay Maximum of $50 in charges allowed per visit |
| Speech Therapy (maximum 30 visits/year) | $25 copay |
| Mental Health and Substance Abuse | Plan pays full amount, but must be approved and certified through Teamster Center Services 1-800-433-4287 |
| Lab Tests (Performed at lab or doctor's office) | $0 (Plan pays full amount) |

| | |
|---|---|
| Hospital Room and Board | $0 (Plan pays full amount |

D 0051

| | up to 120 days) |
|---|---|
| Doctor visits and consultations in the hospital | 10% coinsurance |
| Surgical Service, Surgical Assistant* and Anesthesia<br><br>(*Not allowed in teaching hospitals) | 10% coinsurance |
| Chemotherapy and Radiation Therapy | 10% coinsurance |
| Diagnostic Screening, Tests and Mammography Screening | 10% coinsurance |
| Maternity Care | 10% coinsurance |
| Durable Medical Equipment, Covered Prosthetic and Orthotic Equipment | 10% coinsurance |
| Ambulance | 10% coinsurance (the maximum allowed charge is $300) |
| Emergency Room | $0 per visit (or $75 copay per visit if you're not admitted to the hospital) |

D 0052

**Out-of-network services** are services provided by a licensed provider outside of Horizon's network. When you select out-of-network services that are covered by the Plan:

❑ You will usually have to pay the provider when you receive service;

❑ You will need to file a claim form to be reimbursed by the Fund;

❑ In addition to your normal copay or coinsurance, you must also pay any difference between the amount that an out-of-network provider charges and the maximum amount the Plan would have paid an in-network provider for the same service.

35

D 0053

**Example.** Assume that you go to a doctor in Horizon's network. You pay a $15 copay and the Plan pays the balance – there is no other cost to you.

Suppose you instead sought out-of-network care for the same condition, and the out-of-network doctor charged you $125. For network services, the maximum Horizon would recognize is $100 (less the $15 copay), not $125. So that is all the Fund will recognize in this case. After you submit a claim form for the $125 you paid the doctor, the Fund will pay you $85 ($100 less $15). In addition to the $15 copay, you are responsible for the $25 the doctor charged that exceeded the Plan's reimbursement level, so the total amount you will be required to pay out of pocket for this service is $40. Keep in mind that claims for reimbursement of out-of-network expenses must be submitted to the Fund Office.

### A Word About Out-Of-Network Claims

You must submit a medical claim to the Fund within 90 days of the date that you received a service. A claim submitted more that 90 days after the date of service will not be reimbursed.

D 0054

## Finding a Network Provider

The Fund Office will give you a copy of Horizon's provider directory free of charge. You can also locate a provider by calling Horizon at 1-866-556-4721 or by visiting their web site at www.horizon-healthcare.com.

## Maximum Lifetime Benefit

The maximum lifetime benefit amount payable under the Plan is $250,000. A $10,000 per year benefit is added back to your lifetime maximum, however the total benefit allowed under the Plan will never exceed $250,000 in any one year. For example, if you use $25,000 in benefits in 2005, $10,000 will be added back to your lifetime maximum. The maximum lifetime benefit for end-stage renal disease related benefits, including dialysis and kidney transplants is $30,000.

D 0055

**If you need to see a doctor:**

❑ If you want to take advantage of the additional benefits available when you use a network provider, check your provider directory or contact Horizon at 866-556-4721 to confirm that the provider you want to use is in the network, or to find a provider near you. If you have a computer, you can also get this information online at www.horizon-healthcare.com.

❑ Call to make an appointment.

❑ Write down any questions you may have before your appointment. This way you will not forget to ask your doctor important questions during your appointment

❑ Make a list of any medications you are taking, noting how often you take each one.

❑ Take your ID card when you go to your appointment. Contact the Fund Office if you lose your ID card.

If you decide to use out-of-network services, keep in mind that you will be required to pay the provider and then submit a claim for reimbursement. See the section called "Claims and Appeals" for more information on this procedure.

D 0056

## Alicare Medical Management

The Alicare Medical Management program helps you and your family members identify the most appropriate setting to receive heath care services. The program's purpose is to reduce unnecessary hospitalization and promote the use of safe, cost-effective alternatives to hospitalization.

Together with your doctor, the Medical Management program works to:

❑ Select the most suitable health care setting or service,

❑ Explain the available health care options,

❑ Assure that your stay lasts as long as medically necessary, and

❑ Assist with planning for outpatient services that may be needed after discharge.

**When to contact Alicare.** You must contact Alicare at least 14 days before a planned hospital admission. You must also contact Alicare within 24 hours after an emergency admission.

| When to Contact the Alicare Medical Management Program |
| --- |
| You must contact Alicare for __all__ hospital admissions, excluding psychiatric admissions. You must also contact them upon an |

D 0057

emergency admission. Failure to contact Alicare, where required, will result in a denial of benefits. Alicare can be reached at 800-332-5426. (For alcohol or substance abuse admissions, call Teamster Center Services at 800-433-4287.)

If you fail to obtain precertification from Alicare, your claim will not be paid by the Fund.

**Covered Medical Expenses**

The Plan provides coverage for the following medical expenses, provided you are under the care of a licensed physician and the covered services and supplies are medically necessary:

❑ Hospital services and supplies, including:

- Room and board, up to the semi-private room rate, up to 120 days,

- Specialty unit charges (such as intensive care units and operating rooms),

- Outpatient and emergency room services (when necessary),

- Services and supplies normally required in connection with a hospitalization, such as: X-rays and lab tests; anesthesia; oxygen; dressings and casts; physical and occupational therapy; radiation therapy.

- If you are treated in a hospital that does not have a contract with Horizon, the Plan will reimburse 80% of the

D 0058

amount it would have paid a Horizon facility, and you will be responsible for the difference.

❑ Doctor visits in the office, the hospital, or at home.

❑ Surgical services for treatment of an illness or injury. General anesthesia as part of a covered surgical procedure is also covered when given by a doctor other than the operating surgeon or the surgeon's assistant, as long as the anesthesiologist is a member of the Horizon network. When the procedure is in a hospital, the Plan also covers a surgical assistant who helps the surgeon, as long as the surgical assistant is not a hospital employee and no doctor who is a hospital employee is available to help the surgeon. Surgical assistants are not covered in teaching hospitals.

❑ Diagnostic X-rays and other imaging services, including mammography for women.

❑ Lab tests (performed at a lab or doctor's office).

❑ Chemotherapy and radiation therapy in a doctor's office or other outpatient setting.

❑ Maternity care.

❑ Durable medical equipment, such as wheelchairs and crutches.

D 0059

Exhibit C
# (part 4 of 10)

❑ Prosthetics, such as artificial limbs, and certain orthotic appliances (more details on this below).

❑ Physical therapy (maximum 30 visits a year).

❑ Speech therapy (maximum 30 visits a year).

❑ Chiropractor (maximum 10 visits a year).

❑ Ambulance service.

❑ Mental health and substance abuse treatment (only as prescribed or approved by Teamster Center Services).

❑ "Well child care" (routine checkups and immunizations for children).

**Other Covered Expenses**

Some medical services are subject to special rules and limitations. These are described below.

**Physical therapy and rehabilitation.** For **inpatient** care, the Plan covers up to 10 days each calendar year for stays in participating hospitals primarily for physical therapy, physical medicine and rehabilitation. These services must be performed under programs approved by the New York State Department of

42

Health or other such similar agency in the state where services are provided.

For **outpatient** physical therapy and rehabilitation services, the Plan covers up to 10 visits per calendar year. The therapy must be prescribed by a doctor and seek either to improve or to restore bodily functions within a reasonable period, limited to 10 visits a year.

**Kidney dialysis.** For **inpatient** care, the Plan covers hemodialysis or peritoneal dialysis while the covered individual is a registered bed patient in a hospital. (Note that all payments toward renal diseases will be capped at $30,000.)

For **outpatient** dialysis, the Plan covers the following:

▢ In a hospital or freestanding facility, the Plan pays the cost of necessary treatment in the facility's dialysis program.

▢ For dialysis in the home, the Plan pays the cost of all appropriate and necessary supplies required for home dialysis treatment, as well as the reasonable rental cost of the required equipment.

D 0061

❑ All dialysis benefits will be paid in accordance with the Horizon Healthcare PPO fee schedule for in-network and out-of-network providers.

The plan covers up to $30,000 in all end-stage renal disease related benefits.

**Mental health care.** For both inpatient and outpatient services, you must contact Teamster Center Services (TCS) at 1-800-433-4287. The Plan does not cover any mental health services that have not been arranged or authorized by TCS.

For inpatient mental health care arranged by TCS, the Plan covers up to 30 days per year. For outpatient visits arranged by TCS, the Plan covers up to 40 visits, with a $15 per visit copay. (Up to 10 of these 40 visits may be with an M.D. and up to 30 may be with a Ph.D. and up to 40 may be with a social worker. If you receive services from two types of providers, you are still subject to the overall limit of 40 visits per year.)

**Alcohol and substance abuse treatment.** Treatment for alcohol or substance abuse must also be arranged through Teamster Center

D 0062

Services at 1-800-433-4827. The Plan does not cover any substance abuse treatment that has not been arranged through TCS.

**Inpatient** benefits for necessary TCS-authorized hospitalization for the diagnosis and treatment of alcoholism and/or substance abuse include:

□ Five days of active treatment for detoxification per 12-month period in a TCS-approved facility, and

□ 25 days of inpatient rehabilitation services per 12-month period in a TCS-approved facility.

For **outpatient** diagnosis and treatment of alcoholism and/or substance abuse the Plan provides up to 60 visits per calendar year per covered family. Up to 20 of these visits may be used for family counseling (limited to one such visit per day) for members of the patient's family who are also covered by the Plan, even if the patient's treatment has not yet begun.

**Home care services.** Home care benefits are available under a physician-approved plan of treatment when the necessary services are provided through a New York State-certified home health agency and hospitalization or confinement in a skilled nursing facility would otherwise have been required.

D 0063

Covered services include: part-time professional nursing; part-time home health aide services (up to four hours of such care is equal to one home care visit); physical, occupational or speech therapy; medical supplies, drugs, and medicines prescribed by a physician; necessary laboratory services. The maximum number of visits for home care services is 30 visits per year and must commence within seven (7) days after discharge from a hospital.

**Maternity care.** The Plan provides the following maternity benefits:

❑ on an outpatient basis, routine pregnancy-related care for the mother both before and after the pregnancy (subject to applicable coinsurance;

❑ on an inpatient basis, delivery and any pregnancy-related treatment in a participating hospital or birthing center.

**Note that under federal law maternity benefits must cover a minimum of 48 hours of inpatient care following any delivery other than a caesarean delivery. Following a caesarean delivery, at least 96 hours of coverage must be provided.**

46

If a mother decides to be discharged earlier than 48 hours after a normal delivery or 96 hours after a caesarean delivery, she will be entitled, upon request, to one home care visit. This visit will be within 24 hours after discharge or the time of request, whichever is later. This home care visit is in addition to other home care benefits of this plan and is not subject to the deductible or coinsurance.

Maternity care coverage also includes parent education; assistance and training in breast or bottle feeding, and the performance of any necessary maternal and newborn clinical assessments.

**Newborn children.** For newborn children benefits are available from birth for:

❑ the treatment of illness or injury,

❑ nursery care in an approved premature unit for an infant weighing less than 2,500 grams (5.5 pounds), or

❑ incubator care, regardless of the infant's weight.

D 0065

47

If you have individual coverage at the time your child is born, the newborn will be covered for illness or injury for 30 days from the date of birth. However, for coverage to continue beyond that time, you must apply for family coverage. No coverage is available for children of your covered dependent children.

Benefits are not provided for circumcision of a child less than 30 days of age.

**Women's health care.** The Plan covers the following diagnostic services for women:

❑ mammogram once per year for covered women 35 and older (or at any age if requested by a doctor when indicated by health history),

❑ an annual PAP smear test for covered women 18 years of age and older.

**Diagnostic screening.** The following diagnostic screening services are provided for all covered participants, as indicated below. Note that a screening test is a test for a certain disease when you have no evidence of that disease (the Fund will not provide

D 0066

benefits for any diagnostic screening tests not mentioned below or elsewhere in this summary).

□ Colorectal cancer: screening with either:

- fecal occult blood test (annually for persons age 40 and older)

- sigmoidoscopy (once every two years for persons age 40 and older)

□ Hyperchlesterolemia – screening for serum cholesterol levels once every two years

□ Diabetes – screening for diabetes melitus for either pregnant women or women contemplating pregnancy.

**Prosthetic and orthotic appliances.** When prescribed by a doctor, the Plan covers prosthetics and orthotic appliances that support or replace part or all of a body function or organ. This coverage also includes replacing, repairing, fitting and adjusting such devices. Covered orthotics are rigid or semi-rigid braces which are used to support a weak or deformed body part or to restrict or eliminate motion. Most orthotics are <u>not</u> covered. Orthotics prescribed for podiatric conditions are <u>not</u> covered.

D 0067

**Hospice care.** The Plan covers up to 210 days of hospice care in a hospice, a hospital or at home. To qualify for this benefit:

❑ The covered person must be certified by his or her primary attending physician as having a life expectancy of six months or less.

❑ If the hospice is located in New York State, it must be certified under Article 40 of the New York Public Health Law.

❑ If the hospice is located outside New York State, it must be certified by the state in which the hospice organization is located.

Services typically covered under this benefit include bed patient care and related services when care is provided either in a hospice unit or in a regular hospital bed. When services are provided at home or on an outpatient basis covered services may include the following: intermittent nursing and home health aide care; physical, speech, occupational and respiratory therapy; lab tests and X-rays; social services; nutritional services, medical supplies; rental of durable medical equipment; drugs and medications not of an experimental nature, medical care by the hospice physician; medically necessary transportation between home and the hospital or hospice organization; five visits for

D 0068

bereavement counseling for the covered person's family, either before or after the covered person's death.

Hospice care is covered in full when received through a network provider. If you go to a non-network provider, the plan covers 80% of eligible expenses.

The maximum lifetime benefit amount payable under the plan is $250,000. A $10,000 per year benefit is allowed if the lifetime maximum benefit amount is reached. For example, if in 2005 you exhaust the $250,000 lifetime maximum, in 2006 you will have an additional $10,000 benefit available as long as you maintain coverage under the plan.

**Medical Expenses That Are Not Covered**

Expenses that are not covered by the Plan include, but are not limited to, the following:

▫ Treatment, services or equipment or supplies (including prosthetics and orthotic appliances) that are not medically necessary (in the opinion of Horizon, Alicare or the Fund).

▫ Care in a non-participating hospital except for emergency care for illness or injury.

D 0069

- Sanitarium, custodial or convalescent care; rest cures; care in a hospital for long-term care.

- Hospital confinements or any period of hospital confinement primarily for diagnostic studies.

- Care covered under Workers' Compensation law; care furnished under federal, state (including no-fault auto insurance law) or other laws or programs (except Medicaid), or military service-related care in a veterans' facility or a hospital operated by the United States.

- Elective cosmetic surgery or any related complications. However, under the Women's Health and Cancer Rights Act of 1998, health care plans that provide medical and surgical benefits in connection with mastectomies must also provide benefits for certain reconstructive or related services following a mastectomy. Coverage will be provided for reconstruction of the breast on which the mastectomy has been performed; surgery and reconstruction of the other breast to produce a symmetrical appearance; breast prostheses and surgical bras; and treatment of physical complications of any stage of mastectomy, including lymphedemas.

- Services of private or special nurses, or other private attendants or their board.

D 0070

- Routine physical examinations unrelated to either an illness or an injury, unless specifically included elsewhere in this summary.

- Treatment covered by Medicare, in the case of individuals covered by Medicare.

- Services usually provided without charge, even if charges are billed.

- Travel, even if recommended by a doctor.

- Services for either illness or injury received as a result of war.

- Dental services, including (but not limited to) cavities and extractions, care of either gums or bones supporting the teeth, periodontal abscess, orthodontia, and false teeth. However, the Plan does cover both surgical removal of impacted teeth and treatment due to an accidental injury to sound natural teeth that happens within twelve months of the accident.

- Screening procedures for the following services: worksite screening services provided by an employer at no cost to employees; government health department screening services offered at no cost to recipients; services given in a mobile

D 0071

53

screening unit (van) unless a doctor (not affiliated with the mobile screening unit) prescribes the service; general physical exams or checkups.

- Foot care, including care of corns, bunions, calluses, toenails, flat feet, fallen arches, weak feet, chronic foot strain, or symptomatic complaints of the feet except capsular or bone surgery related to bunions and hammertoes.

- Eyeglasses, contact lenses, or the examination for their fitting except immediately following cataract surgery.

- Hearing aids or the examination for their fitting.

- Services either given by an unlicensed provider or performed outside the scope of the provider's license.

- Services performed at home except those services specifically noted elsewhere as available either in the home or as the result of an emergency.

- Technology, including treatments, procedures, drugs, biologicals or medical devices that, in the sole discretion of Alicare are not medically necessary in that they are experimental, investigational, obsolete or ineffective. Hospitalization and physician services associated with any of these technologies are also not covered.

54

D 0072

"Experimental" or "investigational" means that the technology is:

- not of proven benefit for either the particular diagnosis or treatment of the covered person's condition, or

- not generally recognized by the medical community (as reflected in the published peer-reviewed medical literature) as effective or appropriate for the particular diagnosis or treatment of the covered person's particular condition, or

- in the case of a hospitalization, anything not covered by Medicare.

Government approval of a technology is not necessarily sufficient to render it of proven benefit or appropriate or effective for a particular diagnosis or treatment of a covered person's particular condition.

Alicare and the Fund may apply any or all of the following five criteria when determining whether a technology is experimental, investigational, obsolete or ineffective:

- A medical device, drug, or biological product must have received final approval to market by the U.S. Food and Drug Administration (FDA) for the particular diagnosis or

D 0073

condition. Once FDA approval has been granted for a particular diagnosis or condition, use of the medical device, drug or biological product for another diagnosis or condition may require that any or all of these five criteria be met.

- Conclusive evidence (from the published peer-reviewed medical literature) exists that the technology has a definite positive effect on health outcomes.

- Demonstrated evidence (as reflected in the published peer-reviewed medical literature) exists that over time the technology leads to improvement in health outcomes (i.e., the beneficial effects outweigh any harmful effects).

- Proof (as reflected in the published peer-reviewed medical literature) exists that the technology is at least effective in improving health outcomes, or is usable in appropriate clinical contexts in which established technology is not employable.

- Proof (as reflected in the published peer-reviewed medical literature) exists that improvement in health outcomes (as defined in #3 above) is possible in standard conditions of medical practice, outside investigatory settings.

56

D 0074

**Utilization Management - Plan Features Designed to Help Keep Costs Down**

The Plan includes a number of features designed to manage costs for both you and the Plan and to ensure that you get the most out of the benefits available to you and your family.

**When you need to contact Utilization Management.** You (or a family member or other representative) should contact Alicare's Utilization Management program at 1-800-332-5426:

□ Within one business day of an unscheduled emergency hospital admission;

□ As far in advance of a planned elective admission as possible (This includes one-day admissions and all surgical procedures);

□ Whenever you want a voluntary second surgical opinion.

---

**Contacting Utilization Management.** To get in touch with the Utilization Management Program call Alicare at 1-800-332-5426. The telephone number also appears on the back of your ID card. Business hours are 9 am to 5 pm, Monday through Friday. After

---

D 0075

Exhibit C
# (part 5 of 10)

hours and on weekends you should leave a message and be sure to include:

❑  Your name;

❑  Your Social Security number;

❑  The telephone number (including area code) where you can be reached.

**When you do not have to contact Utilization Management.** You do **not** have to call Utilization Management if:

❑  You are treated and discharged from an emergency room; or

❑  You are admitted to a hospital outside the continental United States because the Fund does <u>not</u> cover any medical expenses incurred outside the United States; or

❑  Your primary coverage is Medicare.

**Preadmission review.** Once you provide notice of a scheduled non-emergency admission, Alicare will conduct a "preadmission review." The preadmission review will include:

D 0076

❑ A review of the reason for the admission;

❑ Assistance in helping you get a voluntary second surgical opinion, if requested;

❑ A discussion with you and your doctor of ambulatory surgery options, if appropriate.

Alicare will send you, your physician and the hospital written confirmation once the preadmission review is completed.

**Surgical procedures that can be done on an outpatient basis ("ambulatory surgery").** Some surgical procedures can be done without an overnight stay in the hospital. Ambulatory surgery offers a safe alternative to inpatient hospitalization, allows you to recuperate at home, and saves health care dollars.

If your physician wants you to go to the hospital for any surgical procedure, you must contact Alicare before admission.

**Voluntary second surgical opinion.** If a doctor recommends a surgical procedure – whether in a hospital or in an ambulatory surgery unit – you can arrange for a second surgical opinion

D 0077

through the Utilization Management Program administered by Alicare.

Alicare will provide the names of three qualified specialists located near your home or place of business. You then choose one of these specialists to visit for your second surgical opinion consultation. You have no claim forms to complete and no out-of-pocket expenses. You will receive maximum benefits regardless of whether you follow the second opinion consultant's recommendation. The final decision of whether to proceed with the surgery is entirely yours.

**Continued stay review**. While you are in the hospital, Alicare will conduct a "continued stay review," which includes:

▫ Working with the hospital and your physician to help make sure your stay lasts only as long as is medically necessary,

▫ Assisting in arranging for other covered services when needed, such as home care, following hospital discharge,

▫ Working with you and your family to identify and arrange continuing health care services in the case of a prolonged illness.

D 0078

In the event the second opinion surgeon disagrees with the original recommendation for surgery, you may obtain a third opinion through the program, again at no cost to you.

**Medical necessity review.** Alicare's Utilization Management staff can usually certify your admission or continued stay without having to talk with your doctor. Occasionally it may be necessary for a program physician to review your case and discuss it with your doctor.

Usually the doctors reach an agreement during this discussion about the necessity of the admission or continued stay in the hospital. Either your physician will agree that an alternative setting (such as an ambulatory surgery unit) is appropriate or the program's physician will agree on the inpatient setting.

In the event that the physicians cannot agree, the Utilization Management Program will notify you, your doctor and the hospital in writing that the inpatient setting has not been approved.

**Appealing medical necessity denials.** See the section called "Claims & Appeals" for information on how you may appeal a medical necessity denial.

D 0079

**Individual case management.** In the event of a catastrophic illness or injury, the Utilization Management Program individual case management staff can provide assistance and support. This program gives you access to social workers and nurses who can help you and your family plan for post-hospital care. Examples of the types of illnesses and injuries case management can help with include:

❑ Cancer

❑ Stroke

❑ AIDS

❑ Chronic illness

❑ Spinal cord and other traumatic injuries.

For case management help you should call Alicare at 800-332-5426.

**Newborn infants requiring specialized care.** Occasionally a complicated or premature delivery, or an illness discovered shortly after birth, may require that a baby remain in the hospital after the mother returns home. In such cases you must remember to call Alicare within 24 hours after the mother's discharge. Case managers can help you arrange for the often

62

D 0080

highly technological care such babies require and enable your child to go home sooner than would otherwise be possible.

**Benefit reductions.** Under the Utilization Management Program, penalties (in the form of a reduction in benefits) may be imposed if you do not comply with program requirements. Specifically:

❑ If you do not notify the Utilization Management Program before an elective hospital admission, or

❑ If you do not contact the Program within one business day after being admitted to the hospital on an emergency basis.

If you do not comply with the procedures outlined above and discussed in this section, you will be responsible for paying the entire cost of your hospital bill.

---

#### Use The Emergency Room Only In An Emergency

The emergency room is the most expensive way to treat a routine ailment like a cold or the flu.

Our Plan covers emergency room care only in the case of a severe medical or behavioral condition the onset of which is sudden and the symptoms of which are severe. It must also be a situation in which a prudent layperson would assume that the absence of emergency care would place the health or bodily functions of the afflicted person (or others, in the case of a behavioral health care emergency) in serious jeopardy.

The Plan will not cover emergency room care in situations like

---

D 0081

the following:

- ☐ It is late at night, the condition is not sudden and serious, and your regular doctor is not available.
- ☐ The hospital is closer than your doctor's office.
- ☐ You do not have a regular doctor.

If you need help locating a physician in the Horizon network, contact Horizon at 1-866-556-4721.

D 0082

## PRESCRIPTION DRUG BENEFIT

The prescription drug benefit is administered for the Fund by National Medical Health Card Systems ("NMHC"), and provides coverage for many prescription medications, as well as some diabetic supplies that are prescribed by a doctor.

### How It Works

You can get prescription drugs three ways – from a participating pharmacy, a non-participating pharmacy, or in the case of "maintenance medication," through a mail-order pharmacy. What you pay depends on which of these options you use.

There are two copayment levels:

□ generic drugs and "preferred" brand name drugs (lowest cost)

□ "non-preferred" brand name drugs (highest cost)

The maximum prescription benefit per year is $5,000.

D 0083

## Summary of Pharmacy Benefits

| When you fill a prescription | You Pay | | |
|---|---|---|---|
| | Generic | Preferred Brand | Non-Preferred Brand |
| At a participating pharmacy (up to a 30-day supply) | $15 copay | $15 copay (if you choose a brand-name drug with a generic equivalent, you will be responsible for the cost difference) | $30 copay (if you choose a brand-name drug with a generic equivalent, you will be responsible for the cost difference) |
| At a non-participating pharmacy (up to a 30-day supply) | $15 copay (plus any amount that exceeds what a network pharmacy would have received) | $15 copay (plus any amount that exceeds what a network pharmacy would have received) | $30 copay (plus any amount that exceeds what a network pharmacy would have received) |
| Through Mail Order (up to a 90-day supply) | $30 copay | $30 copay | $60 copay |

**"Preferred" brand name drugs.** "Preferred" brand name drugs appear on the NMHC preferred drug list. **The copay is twice as high for non-preferred brand name drugs.**

D 0084

The Fund will send a list of the preferred brand name drugs to you, along with a prescription drug identification card. You may want to bring this list, along with your identification card when you visit your healthcare provider.

If you misplace your preferred drug list, or if you do not know which category a medication falls under, you can contact NMH customer service at 800-645-3332, or you can find the list o their web site at www.nmhcrx.com.

---

### A Word About Generic Drugs and Mail-Order

If you need a prescribed medication, do not forget that when you get the "generic" equivalent of a brand-name drug, you save money. Generic drugs contain the same ingredients as brand-name drugs, so when your doctor prescribes a medication, do not forget to ask him or her to request the generic version if there is one

Another way you can save money on prescribed medication is by using the Plan's mail order form. For double the copay you can receive three month's supply of medicine.

If a "generic" equivalent of a brand-name drug is available and you do not receive a "generic" equivalent, the Fund will only pay for the cost of the "generic" equivalent. You are responsible for the copay and any additional cost over the "generic" costs.

---

Participating Pharmacies. There are many pharmacies that participate in the NMHC network. To obtain the names of in network pharmacies in your area, go to the NMHC web site www.nmhcrx.com or call 800-645-3332. When you go to

67                                            D 0085

participating    pharmacy,    give    your    prescription    and
identification  card  to  the  pharmacist.  If  you  misplace  your
prescription identification card, call NMHC at 800-645-3332 and
they will send you a replacement.

**Non-participating pharmacies.** If  you  go  to  an  out-of-network
pharmacy, you will have to pay the full amount and submit a claim
to NMHC for reimbursement. The Plan will reimburse you the same
amount  that  it  would  have  reimbursed  a  participating  pharmacy.
You  are  responsible  for  your  copay  ($15  or  $30),  _plus_  any
difference  between  the  rate  at  which  the  Plan  reimburses  a
participating pharmacy and the amount charged by your pharmacy.

**Mail  order.**  Mail  order  benefits  are  provided  through  NMHC's
Express Pharmacy Services.

"Maintenance  drugs"  are  prescription  drugs  that  are  used  on  a
recurring basis and are usually prescribed for chronic conditions
such  as  diabetes,  arthritis,  high  blood  pressure,  heart
disorders,  depression  and  other  mood  disorders,  and  gastric
diseases.

D 0086

The same treatments and medications that are excluded from coverage under the pharmacy part of the program are also excluded under the mail-order program.

**Having your mail-order prescription filled.** Once your physician has written a prescription for your maintenance medication (which can be for a period of up to 90 days), attach the prescription to a claim form (you can get these from the Fund Office) and include a check or credit card number for the applicable copay. Call the Fund Office to get a mail-order application to you.

You will receive the medication in the mail -- usually within about 15 days after NMHC receives your application.

> **Do not forget. When you use the Mail-Order Pharmacy, you will receive a 90-day supply of your medication.**

**What Is Covered and What Is Not Covered**

**What medications are covered.** "Prescription medication" means medication approved by the Federal Drug Administration ("FDA") that may be legally dispensed only when you have a written prescription from a physician. The Fund does not cover drugs that can be purchased "over the counter," even if your doctor gives you a prescription for such a drug (except Prilosec OTC, which

D 0087

the Fund will cover when prescribed by your doctor). Prilosec OTC must be used before any similar prescription drugs will be approved.

The Plan also covers diabetic supplies prescribed by a physician – needles, syringes, test strips, oral hypoglycemics and blood glucose agents. (The Plan does not cover alcohol swabs.)

**What is not covered.** There are certain medications the Plan cannot cover, and they include:

❑ Drugs which either by law do not require a prescription or are available over-the-counter (except insulin and self-administered injectables).

❑ Devices of any type (e.g., therapeutic devices, diaphragms, artificial appliances, hypodermic needles, syringes, or similar devices) except where specifically covered.

❑ Fertility drugs.

❑ Charges or fees for drug administration or injection.

❑ Vitamins that by law do not require a prescription.

❑ Drugs dispensed to you while you are in a hospital/facility, nursing home, or other institution.

D 0088

Exhibit C
**(part 6 of 10)**

- Investigational or experimental drugs (i.e., medications use for experimental indications and/or dosage regimens determine by the Fund to be experimental).

- Appetite suppressants, except for morbid obesity where th prescription of appetite suppressants is medically necessar and appropriate.

- Compounded medications with no ingredients requiring prescription order.

- Medications for cosmetic purposes only.

- Medications with no approved FDA indications, unless otherwi required by law (i.e., drugs which have been prescribed fo the treatment of a type of cancer for which the drug has n been approved by the FDA).

- Replacement prescription medications resulting from los theft, or breakage.

- The cost of medication dispensed in excess of the contractu limitation (any cost above the "allowed amount").

- Injectable medicines (other than Insulin), unless receiv from Priority Healthcare. Call the Fund Office for mo information.

D 0089

❑ Brand name drugs if a generic is available.

---

If you have any questions about the prescription drug benefit, do not hesitate to call NMHC customer service at 800-645-3332, or visit the web site at www.nmhcrx.com. Click on "member services" to locate a participating pharmacy or to order mail order refills. The customer service hours are Monday-Friday 9 a.m. to 11 p.m. (EST) and Saturday-Sunday 9 a.m. to 5 p.m.

---

D 0090

## DENTAL BENEFIT

The Fund's dental benefits are provided through DDS, Inc. ("DDS"). The Plan has a $100 per patient annual deductible, up to a maximum family deductible of $250 per year. There's also a $1,000 per person annual maximum for all dental services.

**Receiving services.** There are over 400 participating dentists and specialists in the tri-state area. To find a participating dentist, go to the DDS website, www.ddsinc.net. Click "Patients Only," and where asked for a Group #, put in 272. Click on "Find a Provider" to view the panel dentist locations. Call one of the dentists, identify yourself as a member of Local 272, and schedule an appointment.

If you go to a non-participating provider, you must pay the full charge up front. You can file for reimbursement with DDS, who will reimburse you up to the "allowed amount" for that service, less any applicable copay. If the non-participating provider charges you more than the allowed amount, you will be responsible for the additional amount (as well as the copay).

73

D 0091

**Predetermination Requirement**

All claims over $300 must be submitted to DDS for pre-determination of benefits. Your dentist should submit a pre-determination form and any x-rays to the DDS office listed below. You can obtain a claim form by calling DDS or visiting the website at www.ddsinc.net. You can print a claim form by clicking on "Providers Only" and then "Submit Claims."

**Covered Dental Services**

The Plan covers a wide range of the dental services most commonly used -- including checkups, x-rays, cleanings, fillings, extractions, root canals and crowns.

The Schedule of Dental Benefits that appears in this section lists <u>all</u> dental services covered by DDS. Please keep in mind that only those services listed are covered. If a service is not listed, then it is not covered.

> For answers to questions not addressed in this summary, contact DDS at:
>
> 1-800-255-5681
> www.ddsinc.net

D 0092

## SCHEDULE OF DENTAL BENEFITS

| SERVICE | DESCRIPTION | ALLOWED AMOUNT | YOU COP. |
|---------|-------------|----------------|----------|
| 0100 | DIAGNOSTIC SERVICES | | |
| 0150 | COMPREHENSIVE ORAL EXAM | $14.00 | $6.00 |
| 0210 | X-RAYS-COMPLETE SERIES | $25.00 | $10.0 |
| 0220 | X-RAYS-PERIAPICAL (1ST FILM) | $4.00 | $1.00 |
| 0230 | X-RAYS-PERIAPICAL (EACH ADDITIONAL) | $3.00 | $1.00 |
| 0240 | X-RAYS-OCCLUSAL FILM | $8.00 | $3.00 |
| 0270 | X-RAYS-1 BITEWING | $7.00 | $3.00 |
| 0272 | X-RAYS-2 BITEWINGS | $9.00 | $3.00 |
| 0274 | X-RAYS-4 BITEWINGS | $14.00 | $6.00 |
| 0330 | X-RAYS-PANORAMIC FILM | $23.00 | $9.00 |
| 0415 | BACTERIOLOGIC EXAM/TESTS | $16.00 | $8.00 |
| 0470 | DIAGNOSTIC CASTS | $12.00 | $5.00 |

D 0093

| 1000 | PREVENTIVE | | |
|------|-----------|------|------|
| 1110 | DENTAL PROPHYLAXIS-ADULT | $21.00 | $9.00 |
| 1120 | DENTAL PROPHYLAXIS-CHILD | $18.00 | $7.00 |
| 1203 | FLUORIDE TREATMENT | $11.00 | $4.00 |
| 1351 | SEALANT-PER TOOTH | $14.00 | $6.00 |
| 1510 | SPACE MAINTAINER-FIXED UNILAT | $82.00 | $35.00 |
| 1515 | SPACE MAINTAINER-FIXED BILATER | $82.00 | $35.00 |
| 1520 | SPACE MAINTAINER-REMOV.UNILAT | $82.00 | $35.00 |
| 1525 | SPACE MAINTAINER-REMOV.BILATER | $82.00 | $35.00 |
| 2000 | RESTORATIVE | | |
| 2140 | AMALGAM-1 SURFACE,PRIM.,PERM. | $14.00 | $5.00 |
| 2150 | AMALGAM-2 SURFACES,PRIM.,PERM. | $22.00 | $9.00 |
| 2160 | AMALGAM-3 SURFACES,PRIM.,PERM. | $32.00 | $13.00 |
| 2161 | AMALGAM-4+SURFACES,PRIM.,PERM. | $49.00 | $21.00 |
| 2330 | COMPOSITE-1 SURFACE,ANTERIOR | $18.00 | $7.00 |
| 2331 | COMPOSITE-2 SURFACES,ANTERIOR | $28.00 | $12.00 |
| 2332 | COMPOSITE-3 SURFACES,ANTERIOR | $42.00 | $18.00 |
| 2335 | COMPOSITE-4+SURF/INCISAL,ANT. | $53.00 | $22.00 |
| 2391 | COMPOSITE-1 SURFACE,POSTERIOR | $18.00 | $7.00 |
| 2392 | COMPOSITE-2 SURFACES,POSTERIOR | $28.00 | $12.00 |
| 2393 | COMPOSITE-3 SURFACES,POSTERIOR | $42.00 | $18.00 |

D 0094

| 2394 | COMPOSITE-4+SURFACES, POSTERIOR | $53.00 | $22.0 |
| 2510 | INLAY-METALLIC-1 SURFACE | $105.00 | $45.0 |
| 2520 | INLAY-METALLIC-2 SURFACES | $175.00 | $75.0 |
| 2530 | INLAY-METALLIC-3 OR MORE SURF | $280.00 | $120.0 |
| **2700** | **CROWNS** | | |
| 2710 | CROWN-RESIN (LABORATORY) | $210.00 | $90.00 |
| 2720 | CROWN-RESIN HIGH NOBLE METAL | $245.00 | $105.0 |
| 2721 | CROWN-RESIN PREDOM BASE METAL | $245.00 | $105.0 |
| 2722 | CROWN-RESIN NOBLE METAL | 245.00 | 105.00 |
| 2751 | CROWN-PORCE PREDOM BASE METAL | $245.00 | $105.0 |
| 2752 | CROWN-PORCELAIN NOBLE METAL | $280.00 | $120.0 |
| 2780 | CROWN-3/4 CAST HIGH NOBLE MTL | $245.00 | $105.0 |
| 2790 | CROWN-FULL CAST HIGH NOBLE MTL | $245.00 | $105.0 |
| 2791 | CROWN-FULL CAST PREDOM BASE | $245.00 | $105.0 |
| 2792 | CROWN-FULL CAST NOBLE METAL | $245.00 | $105.0 |
| 2910 | RECEMENT INLAY | $14.00 | $6.00 |
| 2920 | RECEMENT CROWN | $18.00 | $7.00 |
| 2930 | STAINLESS STEEL CROWN-PRIM. | $77.00 | $33.00 |
| 2931 | STAINLESS STEEL CROWN-PERM. | $77.00 | $33.00 |
| 2951 | PIN RETENTION-PER TOOTH | $12.00 | $5.00 |
| 2952 | CAST POST AND CORE | $91.00 | $39.00 |
| 2954 | PREFABRICATED POST AND CORE | $91.00 | $39.00 |

D 0095

| 3000 | ENDODONTICS | | |
|------|-------------|---|---|
| 3110 | PULP CAP-DIRECT | $11.00 | $4.00 |
| 3120 | PULP CAP-INDIRECT | $11.00 | $4.00 |
| 3220 | THERAPEUTIC PULPOTOMY | $56.00 | $24.00 |
| 3310 | ROOT CANAL-ANTERIOR | $112.00 | $48.00 |
| 3320 | ROOT CANAL-BICUSPID | 210.00 | $90.00 |
| 3330 | ROOT CANAL-MOLAR | $315.00 | $135.00 |
| 3410 | APICOECTOMY-ANTERIOR | $70.00 | $30.00 |
| 3420 | APICOECTOMY-BICUSPID,1ST ROOT | $105.00 | $45.00 |
| 3425 | APICOECTOMY-MOLAR,1ST ROOT | $140.00 | $60.00 |
| 3426 | APICOECTOMY-EACH ADDL ROOT | $70.00 | $30.00 |

D 0096

| 4000 | PERIODONTICS | | |
|------|--------------|---|---|
| 4210 | GINGIVECTOMY/PLASTY-PER QUAD | $105.00 | $45.0 |
| 4211 | GINGIVECTOMY/PLASTY-1 TO 3 TTH | $14.00 | $6.00 |
| 4260 | OSSEOUS SURGERY-PER QUAD | $280.00 | $120. |
| 4341 | PERIO SCALING/RT PLANNING-QUAD | $28.00 | $12.0 |

| 5000 | PROSTHODONTICS | | |
|------|----------------|---|---|
| 5110 | COMPLETE DENTURE-MAXILLARY | $280.00 | $120. |
| 5120 | COMPLETE DENTURE-MANDIBULAR | $280.00 | $120. |
| 5130 | IMMEDIATE DENTURE-MAXILLARY | $350.00 | $150. |
| 5140 | IMMEDIATE DENTURE-MANDIBULAR | $350.00 | $150. |
| 5211 | PRTL DENT-MAX W/CLASPS-ACRYLIC | $280.00 | $120. |
| 5212 | PRTL DNT-MAND W/CLASPS-ACRYLIC | $280.00 | $120. |
| 5213 | PRTL DENT-MAX W/CLASPS-CAST | $350.00 | $150. |
| 5214 | PRTL DENT-MAND W/CLASPS-CAST | $350.00 | $150. |
| 5281 | REMOVABLE UNILATERAL PRTL-1TTH | $140.00 | $60.00 |
| 5410 | ADJUST COMPLETE DENTURE-MAX | $38.00 | $16.00 |
| 5411 | ADJUST COMPLETE DENTURE-MAND | $38.00 | $16.00 |
| 5421 | ADJUST PARTIAL DENTURE-MAX | $38.00 | $16.00 |
| 5422 | ADJUST PARTIAL DENTURE-MAND | $38.00 | $16.00 |
| 5510 | REPAIR BRKN COMPLETE DENT BASE | $35.00 | $15.00 |
| 5520 | REPLACE MISS/BRKN TTH-COMP DNT | $28.00 | $12.00 |

79

D 0097

| 5610 | REPAIR PRTL RESIN DENTURE BASE | $38.00 | $16.00 |
|---|---|---|---|
| 5620 | REPAIR PARTIAL CAST FRAMEWORK | $38.00 | $16.00 |
| 5630 | REPAIR/REPLACE BROKEN CLASP | $38.00 | $16.00 |
| 5640 | REPLACE BROKEN TEETH-PER TOOTH | $38.00 | $16.00 |
| 5650 | ADD TOOTH TO PARTIAL DENTURE | $53.00 | $22.00 |
| 5660 | ADD CLASP TO PARTIAL DENTURE | $53.00 | $22.00 |
| 5710 | REBASE COMPLETE DENTURE-MAX | $70.00 | $30.00 |
| 5711 | REBASE COMPLETE DENTURE-MAND | $70.00 | $30.00 |
| 5720 | REBASE PARTIAL DENTURE-MAX | $70.00 | $30.00 |
| 5721 | REBASE PARTIAL DENTURE-MAND | $70.00 | $30.00 |
| 5730 | RELINE COMPLETE DENT-MAX-CHAIR | $91.00 | $39.00 |
| 5731 | RELINE COMPLETE DNT-MAND-CHAIR | $91.00 | $39.00 |
| 5740 | RELINE PARTIAL DENT-MAX-CHAIR | $91.00 | $39.00 |
| 5741 | RELINE PARTIAL DENT-MAND-CHAIR | $91.00 | 39.00 |
| 5750 | RELINE COMPLETE DENT-MAX-LAB | $105.00 | $45.00 |
| 5751 | RELINE COMPLETE DENT-MAND-LAB | $105.00 | $45.00 |
| 5760 | RELINE PARTIAL DENT-MAX-LAB | $105.00 | $45.00 |
| 5761 | RELINE PARTIAL DENT-MAND-LAB | $105.00 | $45.00 |

D 0098

| 6000 | FIXED PROSTHETICS | | |
|---|---|---|---|
| 6210 | PONTIC-CAST HIGH NOBLE METAL | $245.00 | $105. |
| 6211 | PONTIC-CAST PREDOM BASE METAL | $210.00 | $90.0 |
| 6212 | PONTIC-CAST NOBLE METAL | $245.00 | $105.( |
| 6241 | PONTIC-PORCE PREDOM BASE METAL | $245.00 | $105.( |
| 6242 | PONTIC-PORCELAIN NOBLE METAL | $280.00 | $120.( |
| 6250 | PONTIC-RESIN HIGH NOBLE METAL | $245.00 | $105.( |
| 6251 | PONTIC-RESIN PREDOM BASE METAL | $245.00 | $105.( |
| 6252 | PONTIC-RESIN NOBLE METAL | $245.00 | $105.( |
| 6545 | RETAINER-CAST METAL-MARYLAND | $245.00 | $105.( |
| 6600 | INLAY-PORCE/CERAMIC-2 SURFACES | $245.00 | $105.( |
| 6601 | INLAY-PORCE/CERAMIC-3+SURFACES | $280.00 | $120.0( |
| 6720 | ABUTMENT-RESIN HIGH NOBLE MTL | $245.00 | $105.0( |
| 6722 | ABUTMENT-PORCELAIN NOBLE METAL | $245.00 | $105.0( |
| 6740 | ABUTMENT-PORCELAIN/CERAMIC | $245.00 | $105.0( |
| 6751 | ABUTMENT-PORCE PREDOM BASE MTL | $245.00 | $105.0( |
| 6752 | ABUTMENT-PORCELAIN NOBLE METAL | $280.00 | $120.0( |
| 6780 | ABUTMENT-3/4 CAST HIGH NOBLE | $245.00 | $105.0( |
| 6790 | ABUTMENT-FULL CAST HIGH NOBLE | $245.00 | $105.0( |
| 6930 | RECEMENT BRIDGE | $42.00 | $18.00 |

D 0099

| 7000 | ORAL SURGERY | | |
|------|-------------|--------|--------|
| 7140 | EXTRACTION-ERUPTED TTH-EXPOSED | $42.00 | $18.00 |
| 7210 | SURGICAL REMOVAL ERUPTED TOOTH | $63.00 | $27.00 |
| 7220 | REMOVAL IMPACTED TTH-SOFT TISS | $88.00 | $37.00 |
| 7230 | REMOVAL IMPACTED TTH-PRTL BONY | $123.00 | $52.00 |
| 7240 | REMOVAL IMPACTED TTH-FULL BONY | $140.00 | $60.00 |
| 7260 | OROANTRAL FISTULA CLOSURE | $105.00 | $45.00 |
| 7280 | SURG EXP.IMPACTED TTH-ORTHO | $105.00 | $45.00 |
| 7281 | SURG EXP.IMPACTED TTH-AID ERUP | $105.00 | $45.00 |
| 7285 | BIOPSY OF ORAL TISSUE-HARD | $70.00 | $30.00 |
| 7286 | BIOPSY OF ORAL TISSUE-SOFT | $105.00 | $45.00 |
| 7310 | ALVEOLOPLASTY W/EXT-QUAD | $70.00 | $30.00 |
| 7320 | ALVEOLOPLASTY W/O EXT-QUAD | $105.00 | $45.00 |
| 7471 | REMOVAL OF EXOSTOSIS-PER SITE | $70.00 | $30.00 |
| 7510 | INCISION & DRAINAGE-INTRAORAL | $56.00 | $24.00 |
| 7520 | INCISION & DRAINAGE-EXTRAORAL | $56.00 | $24.00 |
| 7960 | FRENULECTOMY-(FRENECTOMY) | $70.00 | $30.00 |
| 7970 | EXCISION HYPERPLASTIC TIS-ARCH | $56.00 | $24.00 |

D 0100

| 9000 | MISCELLANEOUS SERVICES | | |
|------|------------------------|---------|---------|
| 9110 | PALLIATIVE TREATMENT | $18.00 | $7.00 |
| 9220 | DEEP SED/GEN ANESTH-1ST 30 MIN | $77.00 | $33.0 |
| 9221 | DEEP SED/GEN ANESTH-EA.ADDL.15 | $35.00 | $15.0 |
| 9310 | CONSULTATION BY SPECIALIST | $25.00 | $10.0 |

D 0101

**Exhibit C**
# (part 7 of 10)

## VISION CARE BENEFIT

Vision care benefits help to pay for the cost of routine eye examinations, frames and lenses. The Fund provides benefits for participants and their dependents, as well as eligible pensioners and their spouses. The benefit is available through the Vision Screening and General Vision Services ("GVS") networks of optical providers.

### How it Works

When you go to a Vision Screening or GVS participating optical center, you and each covered dependent are entitled to a comprehensive eye exam and a pair of eyeglasses or contacts once every 24 months. For covered dependent children up to age 16, an exam and glasses or contacts are available every 12 months. Your Plan benefit covers glasses and contacts from a specific Vision Screening or GVS collection. If you choose frames or contacts outside of the covered selection or lens types that are not covered by the Plan, you will be required to pay a supplement.

To use your vision benefits, contact the Fund Office at (212) 726-9730 for an optical voucher and make an appointment at one of the vision centers listed in the Vision Screening or GVS brochure. If you do not have the brochures, the Fund Office can

D 0102

provide you with one or help you locate a participating center near you.

**Additional Vision Benefits**

If you or a family member is not eligible for benefits, or if you have already used the full value of your benefit, a 30% discount on non-covered items is available.

D 0103

## DEATH AND ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS

### Death Benefits

The Fund provides a lump-sum death benefit for your survivors in the event of your death, from any cause, while you are covered by the Fund.

If you die while covered by the Fund, your designated beneficiary or beneficiaries will receive:

❑ $7,500 under the Plan's regular death benefit provision, and

❑ an additional $7,500 in the event of accidental death (for a total benefit of $15,000 in the event of accidental death).

**Your beneficiary.** When you enroll in the Fund, you will be asked to fill out a death benefit beneficiary designation form. You may name any person or persons you wish to receive this benefit. Beneficiary designation forms are available at the Fund Office. If you do not designate a beneficiary or if your beneficiary dies before you, this benefit will be paid to your estate.

**Changing your beneficiary.** You may change your beneficiary designation at any time by completing a new beneficiary

D 0104

designation form and sending it to the Fund Office. The change or changes will be effective when the Fund Office receives the new form.

> Do not forget that to designate or change your beneficiary you must file a signed beneficiary designation form with the Fund Office. Designation or revocation of a beneficiary by any means other than a signed beneficiary form provided by and filed with the Fund Office will not be effective.

> ### Changes in Family Status
>
> Whenever a change in family status occurs – whether it is a marriage, a separation, a divorce, a death, or the birth or adoption of a child – it is important to think about the effect of that event under all your benefit plans – not just this plan – and any beneficiary designations and coverage elections you may have made. Contact the Fund Office if you have any questions about the effect of these events under the Fund's benefit program.

**Filing a claim for death benefits.** If you die, your beneficiary should notify the Fund Office immediately. The Fund Office will advise your beneficiary what forms and certificates need to be filed in order to receive death benefits. There is more information on claims and appeals procedures at the back of this booklet.

D 0105

**Dismemberment Benefits**

The dismemberment benefit pays you a lump sum in the event you lose a hand, foot, eye, or thumb and index finger of a hand. The amount of the benefit depends on the extent of your loss, and the maximum benefit paid under this feature is $5,000. The following chart shows what the benefit is.

| Dismemberment Benefits | |
|---|---|
| Covered Loss | Benefit |
| *Single Loss* (One hand or one foot or sight in one eye) | $2,500 |
| *Multiple Loss* (Any two or more of one foot, one hand, or sight in one eye) | $5,000 |

**Filing a claim for dismemberment benefits.** Claims for dismemberment benefits should be filed with the Fund Office. There is more information on claims and appeals procedures at the back of this booklet.

D 0106

## Exclusions

Death benefits and dismemberment benefits cannot be paid for losses resulting directly or indirectly from any of the following:

- suicide or attempted suicide,

- bodily or mental illness or disease (for accidental death or dismemberment benefits),

- a bacterial infection other than a pyogenic infection resulting from an accidental injury,

- war, including undeclared war and armed aggression, and

- travel in any aircraft except as a passenger on a regularly scheduled passenger flight of a commercial aircraft. This exclusion includes travel in any military aircraft and flights used for any training purposes.

89

D 0107

## COORDINATION OF BENEFITS

Our plan has a coordination of benefits (COB) provision. This provision ensures that if you or a covered dependent is covered by another group medical plan in addition to this Plan, the two plans will combine their benefit payments so that the total payments do not exceed actual expenses incurred.

### Which Plan Pays First

First, if you are covered by two plans and the other plan does not have a coordination of benefits provision, the other plan will always pay its benefits first, before this Plan pays any benefits.

Second, if both plans have COB provisions, benefits will be paid in the following order:

▢ **Employee/dependent rule.** The plan covering an individual as an employee is primary (i.e., pays first) and the plan covering an individual as a dependent is always secondary (i.e., pays second).

▢ **Birthday rule.** For dependent children of parents who are not separated or divorced, the plan of the parent whose birthdate (month and day, not year) falls earlier in the calendar year

D 0108

is primary and the plan of the parent whose birthday falls later is secondary. (If the parents have the same birthday, the program covering one of the parents longer will have primary responsibility.)

❑ **Children of separated/divorced parents rule.** For dependent children of parents who are separated or divorced, the plan of the parent with custody is the primary plan, unless a court order specifies otherwise.

❑ **Active/inactive rule.** The plan covering an individual who is an active employee (or a dependent of an active employee) is primary and the plan covering an individual as an inactive employee (such as a retired, laid-off or former active employee or a dependent of an inactive employee) is secondary. (However, if the other plan does not have this rule and the two contracts do not agree on which coverage has primary responsibility, then this rule will not apply.)

❑ **Longer/shorter rule.** For situations not governed by the above rules, the plan that has covered the individual longer is the primary plan and the plan that has covered the individual for less time is secondary.

❑ **Medicare.** For active employees and spouses of active employees covered by our Plan who are also Medicare eligible, there are

91                                    D 0109

different COB rules. This Plan is always primary unless you work for an employer that normally employs fewer than 20 employees throughout the year or you or your spouse rejects this coverage and chooses Medicare as primary coverage. However, if you or your spouse does this, the Plan cannot pay any difference between the amount of the medical benefits that Medicare pays and the amount that is actually charged (and you will therefore be waiving coverage from this Fund, which means you will have no coverage for certain types of expenses – such as prescription drugs – that Medicare does not cover).

D 0110

## CLAIM REVIEW AND APPEAL PROCEDURES

This section describes the procedures for filing claims for benefits from the Local 272 Welfare Fund (the Plan). It also describes the procedure for you to follow if your claim is denied in whole or in part and you wish to appeal the decision.

### How to File a Claim

A claim for benefits is a request for Plan benefits made in accordance with the Plan's reasonable claims procedures. In order to file a claim for benefits offered under this Plan, you must submit a completed claim form. Simple inquiries about the Plan's provisions that are unrelated to any specific benefit claim will not be treated as claim for benefits. In addition, a request for prior approval of a benefit that does not require prior approval by the Plan is not a claim for benefits.

A claim form may be obtained from the Fund Office by calling 212-726-9730.

The following information must be completed in order for your request for benefits to be a claim, and for the Fund Office to be able to decide your claim, and must be submitted by you or the

D 0111

Exhibit C
# (part 8 of 10)

provider on a medical claim form usually referred to as a HCFA 1500 or UB-92. The claim form _must_ contain the following information _exactly_ as it appears on Fund records.

❑ Participant name

❑ Participant address

❑ Patient name

❑ Patient address

❑ Patient Date of Birth

❑ Patient Sex

❑ SSN of participant

❑ Date of Service

❑ CPT-4 (the code for physician services and other health care services found in the _Current Procedural Terminology, Fourth Edition_, as maintained and distributed by the American Medical Association)

❑ ICD-9 (the diagnosis code found in the _International Classification of Diseases, 9th Edition, Clinical Modification_ as maintained and distributed by the U.S. Department of Health and Human Services)

❑ Billed charge

❑ Number of Units (for anesthesia and certain other claims)

❑ Federal taxpayer identification number (TIN) of the provider

❑ Billing name and address

D 0112

❑ If treatment is due to accident, accident details.

> **Note:** Claims involving **Urgent Care** (defined later in this section) may be submitted by telephone to the organization that is responsible for administering the particular benefit you are requesting (See section below entitled "Where to File Claims" for organization names and telephone numbers.)  The phone call must be followed in writing within 24 hours with the information listed above.

When you present a prescription to a pharmacy to be filled out under the terms of this plan, that request is not a "claim" under these procedures. However, if your request for a prescription is denied, in whole or in part, you may file a claim and appeal regarding the denial by using these procedures.

**When Claims Must Be Filed**

Claims should be filed within **90 days** following the date the charges were incurred. Failure to file claims within the time required shall not invalidate or reduce any claim, if it was not reasonably possible to file the claim within such time. However, in that case, the claim must be submitted as soon as reasonably

D 0113

possible and **in no event later than** one year from the date the charges were incurred.

## Where To File Claims

**In-Network Services.** You do not have to file a claim for any services you receive from "in-network" providers under Horizon Healthcare, National Medical Health Card Systems, DDS, Vision Screening or General Vision Services. The provider will file these claims for you.

## Out-of-Network Services

You must file a claim form for all services you receive which are "out-of-network." Your claim will be considered to have been filed as soon as it is received at the address below by the specific health organization that is responsible for making the initial determination of the claim ("Health Organization"), or by the Fund Office (if the Plan makes the initial determination of the claim). These are as follows:

- For all Medical Claims, contact the Fund Office:

    Local 272 Welfare Fund
    220 East 23rd Street, Room 805
    New York, NY 10010
    1-212-726-9730
    Fax: 1-212-726-9737

D 0114

□ For Prescription Claims, the Health Organization to contact is:

> National Medical Health Card Systems, Inc.
> Harbor Park Drive
> Port Washington, New York 11050
> 1-800-645-3332

● For Vision, Death and Accidental Death and Dismemberment Claims, the Fund Office is responsible. Contact the Fund Office at:

> Local 272 Welfare Fund
> 220 East 23rd Street, Room 805
> New York, NY 10010
> Phone: 212-726-9730
> Fax: 212-726-9737

Urgent claims may not be submitted in writing, but must be submitted using the telephone numbers listed above.

## Authorized Representatives

An authorized representative, such as your spouse, may complete the claim form for you if you are unable to complete the form yourself and have previously designated the individual to act on your behalf. A form can be obtained from the Fund Office to designate an authorized representative. The Plan may request additional information to verify that this person is authorized

D 0115

to act on your behalf. A health care professional with knowledge of your medical condition may act as an authorized representative in connection with an **Urgent Care Claim** (defined below) without you having to complete the special authorization form.

## Medical Benefits

The claims procedures for medical benefits will vary depending on whether your claim is for a **Pre-Service Claim**, an **Urgent Care Claim**, a **Concurrent Care Claim**, a **Post-Service Claim**, or a **Disability Claim**. Read each section carefully to determine which procedure is applicable to your request for benefits:

## Pre-Service and Urgent Care Claims

A **Pre-Service Claim** is a claim for a benefit for which the Plan requires approval of the benefit (in whole or in part) before medical care is obtained. Under this Plan, prior approval of services is required for hospital admissions (including psychiatric and emergency admissions), inpatient and outpatient surgery, mental health care, substance abuse benefits, MRIs and CTs ("catscans").

> **If you fail to precertify these services, no Plan benefits will be payable for those services.**

98

D 0116

If you improperly file a **Pre-Service Claim**, Alicare will notify you as soon as possible but not later than *5 days* after receipt of the claim, of the proper procedures to be followed in filing a claim. You will only receive notice of an improperly filed Pre-service claim if the claim includes (i) your name, (ii) your specific medical condition or symptom, and (iii) a specific treatment, service or product for which approval is requested. Unless the claim is refiled properly, it will not constitute a claim.

For properly filed **Pre-Service Claims**, you and your doctor will be notified of a decision within *15 days* from receipt of the claim unless additional time is needed. The time for response may be extended up to *15 days* if necessary due to matters beyond the control of the Plan. You will be notified of the circumstances requiring the extension of time and the date by which a decision is expected to be rendered.

If an extension is needed because the Plan needs additional information from you, the extension notice will specify the information needed. In that case you and/or your doctor will have *45 days* from receipt of the notification to supply the additional information. If the information is not provided within that time,

D 0117

your claim will be denied. During the period in which you are allowed to supply additional information, the normal period for making a decision on the claim will be suspended. The deadline is suspended from the date of the extension notice until either 45 days or the date you respond to the request (whichever is earlier). The Plan then has 15 days to make a decision on a **Pre-Service Claim** and notify you of the determination.

An **Urgent Care Claim** is any claim for medical care or treatment with respect to which the application of the time periods for making pre-service claim determinations:

❑ could seriously jeopardize the life or health of the claimant or the ability of the claimant to regain maximum function, or

❑ in the opinion of a physician with knowledge of the claimant's medical condition, would subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

Whether your claim is an **Urgent Care Claim** is determined by the Plan applying the judgment of a prudent layperson who possesses an average knowledge of health and medicine. Alternatively, any claim that a physician with knowledge of your medical condition

D 0118

determines is an **Urgent Care Claim** within the meaning described above, shall be treated as an **Urgent Care Claim**.

If you improperly file an **Urgent Care Claim**, Alicare will notify you as soon as possible but not later than *24 hours* after receipt of the claim, of the proper procedures to be followed in filing a claim. Unless the claim is refiled properly, it will not constitute a claim.

If you are requesting precertification of an **Urgent Care Claim**, the time deadlines are different. The Plan will respond to you and/or your doctor with a determination by telephone as soon as possible taking into account the medical exigencies, but not later than *72 hours* after receipt of the claim by the Plan. The determination will also be confirmed in writing.

If an **Urgent Care Claim** is received without sufficient information to determine whether or to what extent benefits are covered or payable, Alicare will notify you and your doctor as soon as possible, but not later than *24 hours* after receipt of the claim, of the specific information necessary to complete the claim. You and/or your doctor must provide the specified information within 48 hours. If the information is not provided within that time, your claim will be denied.

D 0119

Notice of the decision will be provided no later than 48 hours after the plan receives the specified information or the end of the period given for you to provide this information, whichever is earlier.

**Concurrent Claims**

A Concurrent Claim is a claim that is reconsidered after an initial approval was made and results in a reduction, termination or extension of a benefit. (An example of this type of claim would be an inpatient hospital stay originally certified for five days that is reviewed at three days to determine if the full five days is appropriate.) In this situation a decision to reduce, terminate or extend treatment is made concurrently with the provision of treatment.

A reconsideration of a benefit with respect to a Concurrent Claim that involves the *termination or reduction* of a previously-approved benefit (other than by plan amendment or termination) will be made by Alicare as soon as possible, but in any event early enough to allow you to have an appeal decided before the benefit is reduced or terminated.

D 0120

102

Any request by a claimant to *extend* approved Urgent Care treatment will be acted upon by Alicare within 24 hours of receipt of the claim, provided the claim is received at least 24 hours prior to the expiration of the approved treatment. A request to extend approved treatment that does not involve urgent care will be decided according to pre-service or post-service timeframes, whichever applies.

**Post-Service Claim**

The following procedure applies to **Post-Service Claims**. A **Post-Service Claim** is a claim that is not a **Pre-Service Claim** (for example, a claim submitted for payment after health services and treatment have been obtained).

- Obtain a claim form.
- Complete the employee's portion of the claim form.
- Have your Physician either complete the Attending Physician's Statement section of the claim form, submit a completed HCFA health insurance claim form, or submit a HIPAA-compliant electronic claims submission.
- Attach all itemized Hospital bills or doctor's statements that describe the services rendered.

D 0121

Check the claim form to be certain that all applicable portions of the form are completed and that you have submitted all itemized bills. By doing so, you will speed the processing of your claim. If the claim forms have to be returned to you for information, delays in payment will result.

You do not have to submit an additional claim form if your bills are for a continuing disability and you have filed a claim within the past calendar year period. Mail any further bills or statements for any Medical or Hospital services covered by the Plan to the Fund Office as soon as you receive them.

Ordinarily, you will be notified of the decision on your **Post-Service claim** within *30 days* from the Plan's receipt of the claim. This period may be extended one time by the Plan for up to *15 days* if the extension is necessary due to matters beyond the control of the Plan. If an extension is necessary, you will be notified before the end of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision.

If an extension is needed because the Plan needs additional information from you, the extension notice will specify the information needed. In that case you will have *45 days* from

104

receipt of the notification to supply the additional information. If the information is not provided within that time, your claim will be denied. During the period in which you are allowed to supply additional information, the normal period for making a decision on the claim will be suspended. The deadline is suspended from the date of the extension notice until either 45 days or until the date you respond to the request (whichever is earlier). The Plan then has *15 days* to make a decision on a **Post-Service Claim** and notify you of the determination.

**Disability Claims**

A **Disability Claim** is any claim that requires a finding of total disability as a condition of eligibility.

For **Disability Claims**, the Plan will make a decision on the claim and notify you of the decision within *45 days*. If the Plan requires an extension of time due to matters beyond the control of the Plan, the Plan will notify you of the reason for the delay and when the decision will be made. This notification will occur before the expiration of the 45-day period. A decision will be made within *30 days* of the time the Plan notifies you of the delay. The period for making a decision may be delayed an additional *30 days*, provided the Plan administrator notifies you, prior to the expiration of the first 30-day extension period, of

D 0123

the circumstances requiring the extension and the date as of which the Plan expects to render a decision.

If an extension is needed because the Plan needs additional information from you, the extension notice will specify the information needed. In that case you will have *45 days* from receipt of the notification to supply the additional information. If the information is not provided within that time, your claim will be denied. During the period in which you are allowed to supply additional information, the normal period for making a decision on the claim will be suspended. The deadline is suspended from the date of the extension notice until either 45 days or until the date you respond to the request (whichever is earlier). Once you respond to the Plan's request for the information, you will be notified of the Plan's decision on the claim within *30 days*.

For Disability Claims, the plan reserves the right to have a Physician examine you (at the Plan's expense) as often as is reasonable while a claim for benefits is pending.

**Notice of Decision**

You will be provided with written notice of a denial of a claim (whether denied in whole or in part). This notice will state:

Exhibit C
# (part 9 of 10)

- The specific reason(s) for the determination.

- Reference to the specific Plan provision(s) on which the determination is based.

- A description of any additional material or information necessary to perfect the claim, and an explanation of why the material or information is necessary.

- A description of the appeal procedures and applicable time limits.

- A statement of your right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on review.

- If an internal rule, guideline or protocol was relied upon in deciding your claim, you will receive either a copy of the rule or a statement that it is available upon request at no charge.

- If the determination was based on the absence of medical necessity, or because the treatment was experimental or investigational, or other similar exclusion, you will receive an explanation of the scientific or clinical judgment for the

D 0125

determination applying the terms of the Plan to your claim, or a statement that it is available upon request at no charge.

- For **Urgent Care Claims**, the notice will describe the expedited review process applicable to **Urgent Care Claims**. For **Urgent Care Claims**, the required determination may be provided orally and followed with written notification.

- For **Urgent Care Claims** and **Pre-Service Claims**, you will receive notice of the determination even when the claim is approved.

**Request for Review of Denied Claim**

If your claim is denied in whole or in part, or if any adverse benefit determination is made with respect to your claim, you may ask for a review.

All appeals for medical claims are made to the Fund Office at:

      Local 272 Welfare Fund
      220 East 23rd Street, Room 805
      New York, NY 10010
      Phone: 212-726-9730
      Fax: 212-726-9737

All appeals for Prescription Claims are made to National Medical Health Card Systems at the following address:

D 0126

National Medical Health Card Systems, Inc.
    Harbor Park Drive
    Port Washington, New York 11050

All appeals for Dental Claims are made to DDS at the following address:

    DDS Inc.
    1640 Hempstead Turnpike
    East Meadow, NY 11554

All appeals for Vision Claims are made to the Fund Office at:

    Local 272 Welfare Fund
    220 East 23rd Street, Room 805
    New York, NY 10010
    Phone: 212-726-9730
    Fax: 212-726-9737

Appeals for Death and AD&D Claims are made to the Fund Office at:

    Local 272 Welfare Fund
    220 East 23rd Street, Room 805
    New York, NY 10010
    Phone: 212-726-9730
    Fax: 212-726-9737

Your request for review must be made in writing within *180 days* after you receive notice of denial.

**Note**: Appeals involving **Urgent Care Claims** may be made orally by calling Alicare at 1-800-332-5426.

D 0127

**Review Process**

The review process works as follows:

- You have the right to review documents relevant to your claim. A document, record or other information is relevant if it was relied upon by the Plan in making the decision; it was submitted, considered or generated (regardless of whether it was relied upon); it demonstrates compliance with the Plan's administrative processes for ensuring consistent decisionmaking; or it constitutes a statement of plan policy regarding the denied treatment or service.

- Upon request, you will be provided with the identification of medical or vocational experts, if any, that gave advice to the Plan on your claim, without regard to whether their advice was relied upon in deciding your claim.

- Your claim will be reviewed by a person who is not subordinate to (and shall not afford any deference to) the one who originally made the adverse benefit determination. The decision will be made on the basis of the record, including such additional documents and comments that may be submitted by you.

- If your claim was denied on the basis of a medical judgment (such as a determination that the treatment or service was not medically necessary, or was investigational or experimental), a health care professional who has appropriate training and experience in a relevant field of medicine will be consulted.

**Timing of Notice of Decision on Appeal**

☐ **Pre-Service Claims:** You will be sent a notice of decision on review within 30 days of receipt of the appeal by the Health Organization, or Fund Office, as applicable.

☐ **Urgent Care Claims:** You will be sent a notice of a decision on review within 72 hours of receipt of the appeal by the Health Organization, or Fund Office, as applicable.

☐ **Concurrent Claims:** A reconsideration of a benefit with respect to a Concurrent Claim that involves the *termination or reduction* of a previously-approved benefit (other than by plan amendment or termination) will be made by Alicare as soon as possible, but in any event early enough to allow you to have an appeal decided before the benefit is reduced or terminated.

☐ **Post-Service Claims:** Ordinarily, decisions on appeals involving Post-Service Claims will be made at the next regularly scheduled meeting of the Board of Trustees following

D 0129

receipt of your request for review. However, if your request for review is received within 30 days of the next regularly scheduled meeting, your request for review will be considered at the second regularly scheduled meeting following receipt of your request. In special circumstances, a delay until the third regularly scheduled meeting following receipt of your request for review may be necessary. You will be advised in writing in advance if this extension will be necessary. Once a decision on review of your claim has been reached, you will be notified of the decision as soon as possible, but no later than 5 days after the decision has been reached.

□ **Disability Claims:** The decision will be made in the same manner as for Post-Service Claims.

**Notice of Decision on Review**

The decision on any review of your claim will be given to you in writing. The notice of a denial of a claim on review will state:

□ The specific reason(s) for the determination

□ Reference to the specific plan provision(s) on which the determination is based

D 0130

❑ A statement that you are entitled to receive reasonable access to and copies of all documents relevant to your claim, upon request and free of charge

❑ A statement of your right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on review.

❑ If an internal rule, guideline or protocol was relied upon by the Plan, you will receive either a copy of the rule or a statement that it is available upon request at no charge.

❑ If the determination was based on medical necessity, or because the treatment was experimental or investigational, or other similar exclusion, you will receive an explanation of the scientific or clinical judgment for the determination applying the terms of the Plan to your claim, or a statement that it is available upon request at no charge.

**Limitation on When a Lawsuit may be Started**

You may not start a lawsuit to obtain benefits until after you have requested a review and a final decision has been reached on review, or until the appropriate time frame described above has elapsed since you filed a request for review and you have not received a final decision or notice that an extension will be

D 0131

necessary to reach a final decision. The law also permits you to pursue your remedies under section 502(a) of the Employee Retirement Income Security Act without exhausting these appeal procedures if the Plan has failed to follow them.

No lawsuit may be started more than 3 years after the end of the year in which medical or dental services were provided, or, if the claim is for short term disability benefits, more than 3 years after the start of the disability.

114

D 0132

## THIRD PARTY LIABILITY

### Advance on Account of Plan Benefits

The Plan does not cover expenses for services or supplies for which a third party is required to pay because of a negligent, wrongful, or other act, but it will advance payment on account of Plan benefits (hereafter called an "Advance"), **subject to its right to be reimbursed to the full extent of any Advance payment from the covered participant and/or dependent(s) and when there is any recovery from any third party.  The right of reimbursement will apply:**

- ❑ even if the recovery is not characterized in a settlement or judgment as being on account of the medical or dental expenses for which the Advance was made; and

- ❑ even if the recovery is not sufficient to make the ill or injured participant and/or dependent(s) whole pursuant to state law or otherwise (sometimes referred to as the "make-whole" rule; and

- ❑ without any reduction for legal or other expenses incurred by the participant and/or dependent(s) in connection with the recovery against the third party or that third party's insurer pursuant to state law or otherwise (sometimes referred to as the "common fund" rule); and

D 0133

- regardless of the existence of any state law or common law rule that would bar recovery from a person or entity that caused the illness or injury, or from the insurer of that person or entity (sometimes referred to as the "collateral source" rule).

**Subrogation Agreement**

The covered participant and/or any covered dependent(s) on whose behalf the Advance is made must sign and deliver a subrogation agreement (hereafter called the "Agreement") in a form provided by or on behalf of the Plan. If the ill or injured dependent(s) is a minor or incompetent to execute that Agreement, that person's parent (in the case of a minor dependent child) or spouse or legal representative (in the case of an incompetent adult) must execute that Agreement upon request by the Plan Administrator or its designee.

If the Agreement is not executed at the Plan Administrator's request, the Plan may refuse to make any Advance, but if, at its sole discretion, the Plan makes an Advance in the absence of an Agreement, that Advance will not waive, compromise, diminish, release, or otherwise prejudice any of the Plan's rights.

D 0134

**Exhibit C**
# (part 10 of 10)

### Cooperation with the Plan by All Covered Individuals

By accepting an Advance, regardless of whether or not an Agreement has been executed, the covered participant and/or covered dependent(s) each agree to:

- reimburse the Plan for all amounts paid or payable to the covered participant and/or covered dependent(s) or that third party's insurer for the entire amount Advanced; and

- do nothing that will waive, compromise, diminish, release, or otherwise prejudice the Plan's subrogation rights; and

- notify and consult with the Plan Administrator or designee before starting any legal action or administrative proceeding against a third party based on any alleged negligent or wrongful act that may have caused or contributed to the injury or illness that resulted in the Advance, or entering into any settlement Agreement with that third party or third party's insurer based on those acts; and

- inform the Plan Administrator or its designee of all material developments with respect to all claims, actions, or proceedings they have against the third party.

### Subrogation

- By accepting an Advance, the covered participant and/or covered dependent(s) jointly agree that the Plan will be subrogated to the covered participant and/or covered

D 0135

dependent's right of recovery from a third party or that third party's insurer for the entire amount Advanced, regardless of any state or common law rule to the contrary, including, without limitation, a so-called collateral source rule (that would have the effect of prohibiting the Plan from recovering any amount). This means that, in any legal action against a third party who may have wrongfully caused the injury or illness that resulted in the Advance, the Plan may be substituted in place of the covered participant and/or covered dependent(s), but only to the extent of the amount of the Advance.

☐ Under its subrogation rights, the Plan may, in its discretion:

- start any legal action or administrative proceeding it deems necessary to protect its right to recover its Advances, and try or settle that action or proceeding in the name of and with the full cooperation of the covered Participant and/or covered Dependent(s), but in doing so, the Plan will not represent or provide legal representation for the covered participant and/or covered dependent(s) with respect to their damages that exceed any Advance; or

- intervene in any claim, legal action, or administrative proceeding started by the covered participant or covered dependent(s) against any third party or third party's insurer on account of any alleged negligent or wrongful

D 0136

action that may have caused or contributed to the injury or illness that resulted in the Advance.]

**Remedies Available to the Plan**

If the covered participant or covered dependent(s) does not reimburse the Plan as required by this provision, the Plan may, in its sole discretion:

- apply any future Plan benefits that may become payable on behalf of the covered participant and/or covered dependent(s) to the amount not reimbursed; or

- obtain a judgment against the covered participant and/or covered dependent(s) for the amount Advanced and not reimbursed, and garnish or attach the wages or earnings of the covered participant and/or covered dependents.

## IMPORTANT INFORMATION ABOUT THE WELFARE FUND

The Employee Retirement Income Security Act of 1974, as amended (ERISA) requires that participants in employee benefit plans receive certain administrative information about their plans and the people who run them. Our Plan is subject to those rules and this section will tell you more about Plan operations.

**Name of Plan.** The Plan's formal name is the Local 272 Welfare Fund.

D 0137

119

**Board of Trustees.** The Board of Trustees and/or its duly authorized designee(s) has the exclusive right, power and authority, in its sole and absolute discretion, to administer, apply and interpret the Plan, including this booklet, the Trust Agreement and any other Plan documents, and to decide all matters arising in connection with the operation or administration of the Fund or Trust. Without limiting the generality of the foregoing, the Board of Trustees and/or its duly authorized designee(s) shall have the sole and absolute discretionary authority to:

- Take all actions and make all decisions with respect to the eligibility for, and the amount of, benefits payable under the Plan.

- Formulate, interpret and apply rules, regulations and policies necessary to administer the Plan in accordance with the terms of the Plan.

- Decide questions, including legal or factual questions, relating to the calculation and payment of benefits under the Plan.

- Resolve and/or clarify any ambiguities, inconsistencies and omissions arising under the Plan, including this booklet, the Trust Agreement or other Plan documents.

D 0138

❑ Process and approve or deny benefit claims.

❑ Determine the standard of proof required in any case.

All determinations and interpretations made by the Board of Trustees and/or its duly authorized designee(s) shall be final and binding upon all participants, beneficiaries and any other individuals claiming benefits under the Plan. The Board of Trustees may delegate any other such duties or powers as it deems necessary to carry out the administration of the Plan.

The Board of Trustees also reserves the right in its sole and absolute discretion to amend or terminate the Plan at any time and for any reason. Continuation of benefits is not guaranteed. Neither you, your beneficiaries nor any other person has or will have a vested or nonforfeitable interest in the Plan. In the event of the Plan's termination (which might occur if the Union and the employers negotiate the discontinuance of contributions or if the contributions called for by the collective bargaining agreements are insufficient to allow the Plan to continue), the Board of Trustees will apply the monies in the Fund to provide benefits or otherwise carry out the purpose of the Plan in an equitable manner until the Fund assets have been disbursed. In no event will any part of the Fund assets revert to the employers or

D 0139

to the Union. The Board of Trustees consists of an equal number of employer and Union representatives.

**Plan Sponsor and Administrator.** The Board of Trustees is the Plan Sponsor and Plan Administrator. The Trustees have delegated to the Fund Office the authority to administer the Plan on a day-to-day basis.

**Identification Numbers.** The "employer identification number" assigned to the Fund by the Internal Revenue Service is 13-5555808. The identification number assigned to the Plan by the Board of Trustees, pursuant to IRS instructions, is 501.

**Plan Year.** Plan records are kept on a "Plan Year" basis. The Plan Year is from December 1 to November 30.

**Type of Plan.** Our Plan is known as a "welfare" plan under ERISA. It provides medical, prescription drug, dental, vision, death, and accidental death and dismemberment benefits.

**Agent for Service of Legal Process.** In the event of a legal dispute involving the Plan, legal documents may be served on:

Fund Manager
Local 272 Welfare Fund

D 0140

220 East 23rd Street, Room 805
New York, NY 10010

Legal process may also be served on any individual Trustee at the Fund Office address.

**Collective Bargaining Agreement/Contributing Employers.** The Fund is established and maintained in accordance with one or more collective bargaining agreements. A copy of any such agreement(s) may be obtained upon written request to the Fund Office, and is available for examination during normal business hours at the Fund Office. In addition, a complete list of the bargaining units participating in the Fund may be obtained upon written request to the Fund Office and is available for examination by participants and beneficiaries during normal business hours at the Fund Office. The Fund Office may charge a reasonable amount for copies.

Participants and beneficiaries may also receive from the Fund Office, upon written request, information as to whether a particular employer or employee organization is participating in the Fund and, if the employer or employee organization is participating, its address.

123

D 0141

**Source of Contributions.** The benefits described in this booklet are provided through employer contributions and, in some cases, employee contributions. The amount of employer contributions and the employees on whose behalf contributions are made are determined by the provisions of the applicable collective bargaining agreements. The Fund Office will provide, upon written request, information as to whether a particular employer is contributing to the Fund on behalf of employees.

The amount of any employee contributions made is determined as the difference between the cost of the applicable coverage and the amount of any employer contributions made on the employee's behalf.

**Trust Fund.** All assets are held in trust by the Board of Trustees for the purpose of providing benefits to covered participants, either through the direct payment of benefits or the payment of premiums to entities that insure these benefits, and defraying reasonable administrative expenses.

**Self-Funded Benefits.** Currently, medical benefits, prescription drug, dental (except for out-of-area dental), vision, death, and accidental death and dismemberment benefits are self funded, which means they are paid directly out of Fund assets, rather

D 0142

than through an insurance policy. However, in some of these cases, the Fund has contracted with outside providers to administer these benefits - process claims, etc. These entities (and any successors to them) are described at the end of this booklet.

D 0143

## YOUR RIGHTS UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA)

As a participant in the Local 272 Welfare Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act OF 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

**Receive Information About Your Plan and Benefits**

❏ Examine, without charge, at the Fund Office and at other specified locations, such as work locations and union halls, all documents governing the Plan, including summary plan descriptions, collective bargaining agreements, and a copy of the latest annual report (Form 5500 series).

❏ Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including collective bargaining agreements, and copies of the latest annual report (Form 5500 series) and an updated summary plan description. The Plan Administrator may make a reasonable charge for the copies.

❏ Receive a summary of the Plan's annual financial report. The Trustees are required by law to furnish each participant with a copy of this summary annual report.

D 0144

## Continue Group Health Plan Coverage

❏ Continue health coverage for yourself, spouse or dependents if there is a loss of coverage under the Plan as a result of a "qualifying event." You or your dependents will be required to pay for such coverage. Review this summary plan description and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

❏ Reduction or elimination of exclusionary periods of coverage for preexisting conditions under your group health plan. You should be provided a certificate of creditable coverage, free of charge, from your group health plan or insurance issuer when you lose coverage under the Plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage. Without evidence of creditable coverage, you may be subject to a preexisting condition exclusion for 12 months (18 months for late enrollees) after your enrollment date in your coverage.

## Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the

D 0145

operation of the employee benefit Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

D 0146

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

### Assistance With Your Questions

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest Office of the Employee Benefits Security Administration (formerly the Pension and Welfare Benefits Administration), U.S. Department of Labor, listed in your telephone directory, or:

D 0147

Division of Technical Assistance and Inquiries
Employee Benefits Security Administration
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington D.C, 20210.

You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

D 0148

## ADMINISTRATION AND CONTACT INFORMATION

| BENEFIT | TYPE OF ADMINISTRATION | TYPE OF FUNDING |
|---|---|---|
| Hospital and Medical | Horizon Healthcare P.O. Box 79 Newark, NJ 07101-0079 | Self-funded. The Fund pays the cost of benefits. |
| Precertification Utilization Review Medical Management | Alicare 730 Broadway New York, NY 10003-9511 | Self-funded. The Fund pays the cost of benefits. |
| Prescription Drugs | National Medical Health Card Systems, Inc. Harbor Park Drive Port Washington, New York 11050 1-800-645-3332 | Self-funded. The Fund pays the cost of benefits, which are administered by NMHC. |
| Dental | DDS Inc. 1640 Hempstead Turnpike East Meadow, N.Y. 11554 | Self-funded. The Fund pays the cost of benefits, which are administered by DDS. |
| Vision | General Vision Services 330 West 42nd Street New York, NY 10036 1-800-Vision-1 Vision Screening 191 Middle Country Road Centereach, NY 11720 1-800-652-0063 | Self-funded. The Fund pays the cost of benefits, which are administered by GVS or Vision Screening. |
| Death and Accidental Death & Dismemberment | Local 272 Welfare Fund 220 East 23rd Street, Room 805 New York, NY 10010 Phone: 212-726-9730 Fax: 212-726-9737 | Self-funded. The Fund pays the cost of and administers the benefits. |

D 0149

# EXHIBIT D

the HHICNY to determine whether such treatments, procedures, services or supplies are experimental or investigational.

K.    **PARTICIPANT(S)** means an eligible employee or a covered dependent as determined by the Employer according to the eligibility rules of the Benefit Plan, as amended from time to time by the Board of Trustees.

*Fund*

L.    **PARTICIPATING PROVIDER** means a hospital, healthcare facility, licensed physician, social workers, nurse anesthetists, nurse midwives, private-duty nurses, DME suppliers, infusion therapists, or testing and diagnostic X-ray laboratories that have contracted with HHICNY.

M.    **PANEL** means a comprehensive network of Participating Providers in a Service Area.

N.    **PROVIDER** means a hospital, healthcare facility, or licensed physicians or other licensed or certified social workers, nurse anesthetists or nurse midwives, private-duty nurses, DME suppliers, infusion therapists, or testing and diagnostic laboratories that are permitted to and who provide Covered Services to Participants.

O.    **SERVICE AREA** refers to the geographic areas set forth in HHICNY's Provider Directories where HHICNY Participating Providers are available to provide service for eligible Participants.

P.    **SERVICE CHARGE** means the fees charged by HHICNY per Eligible Employee per month as set forth in Section VI of this Agreement.

## II. NETWORK ADMINISTRATION SERVICES

A.    **Network Access.**

1.    HHICNY represents that it has established and will maintain a Panel of Participating Providers having the quality, quantity, diverse medical specialties, geographic distribution, and time availability to provide a full range of high quality, easily accessible Covered Services to Participants in the Service Area.

2.    HHICNY represents that each Participating Provider will enter into a written agreement with HHICNY.

3.    Participating Providers shall comply with applicable licensing standards of medical practice.

-3-

4. HHICNY represents that it will ensure that Participating Providers are licensed by the state in which they provide healthcare services to Participants at the time such Participating Providers are accepted into the Panel.

5. HHICNY represents that Participating Providers will be in compliance with all applicable state and/or federal laws including, but not limited to, all laws related to referral of patients and/or physician ownership of healthcare facilities at the time such Participating Providers are accepted into the Panel.

6. HHICNY shall provide the ~~"THE FUND"~~ *Fund* with reasonable written or electronically transmitted notice of the addition or removal of any Participating Provider to or from the Panel including the effective termination date *of* such addition or removal. HHICNY shall also provide ~~"THE FUND"~~ *the Fund* with written notice of any remedial and/or disciplinary action taken against any Participating Provider.

7. HHICNY shall ensure that the rates charged to the ~~"THE FUND"~~ *Fund* and/or Participants for Covered Services by Participating Providers shall not exceed HHICNY's applicable Schedule of Payments, as amended from *Fund* time to time. HHICNY agrees that the ~~Employer~~ and/or its Participants shall receive the full amount of all discounts, rebates, or adjustments granted by Participating Providers to HHICNY either directly or indirectly related to Covered Services rendered to Participants. HHICNY shall inform ~~"THE FUND"~~ *the Fund* electronically or in writing, of any changes to HHICNY's schedule of professional Provider payments. The ~~"THE FUND"~~ *Fund* shall not be financially liable to pay any retroactive fee schedule change amounts. The ~~"THE FUND"~~ shall not be financially liable for any fee schedule payment increases unless the ~~"THE FUND"~~ has been informed electronically or in writing of any such Provider fee schedule increases. √ *Fund*

8. HHICNY will require Participating Providers to accept payment from ~~"THE FUND"~~ *the Fund* as payment in full for Covered Services and shall not balance bill Participants; provided, however, that a Participating Provider shall collect any Deductible amount, Copayment, or Coinsurance amounts for which Participants are financially obligated under the Benefit Plan. Deductible amounts, Copayments or Coinsurance due from Participants under the Benefit Plan for Covered Services shall be calculated based on any and all discounts granted by Participating Providers rendering such Covered Services.

9. <u>Network Physician, Hospital and Ancillary Provider Claims Administration</u> [of FUND]

HHICNY hereby delegates to the ~~"THE FUND"~~ [The Fund] the responsibility for the processing and payment of all ~~network hospital~~ claims. ~~"THE FUND"~~ [The Fund] shall administer such claims in accordance with its obligations as contained in Section V of this Agreement. HHICNY shall update these media listings, as appropriate, of any changes to such fee schedules.

*[handwritten: What Does This Reference?]*

B. <u>Participant Communications</u>

1. Upon the ~~"THE FUND"'s~~ [Fund's] request, HHICNY shall review and provide reasonable assistance to ~~"THE FUND"~~ [the fund] in preparing booklets and other materials describing the benefits offered by the ~~"THE FUND"~~ [FUND] under the Plan and enrollment cards and instructions for their use. HHICNY shall provide this service at, ~~HHICNY's~~ [Payfor Fund] cost to ~~"THE FUND"~~. The ~~"THE FUND"~~ [the Fund] shall review, approve, and be responsible for the content of each document except Participating Provider directories. The ~~"THE FUND"~~ [Fund] shall retain sole responsibility for distributing all such materials to Plan Participants.

2. HHICNY shall be responsible for the printing of Participant directories and shall charge the $4.80 per directory delivered to the ~~Employer~~ [Fund] in accordance with Section VI of this Agreement. HHICNY shall have the opportunity to review and must approve of the ~~"THE FUND"~~ [Fund] Participant identification cards before issuance.

3. HHICNY shall have a representative available to attend meetings with Participants, employers, and ~~"THE FUND"~~ [the Fund's Trustees and] staff when requested reasonably in advance, for the purpose of participating in training and education regarding implementation and use of the HHICNY panel.

4. HHICNY shall designate a representative to be the regular contact with [The Fund] ~~"THE FUND"~~ staff for all customer service issues including, but not limited to, complaints relating to Participating Providers. HHICNY shall notify the ~~"THE FUND"~~ [Fund] within two (2) business days of a change in the designee.

5. HHICNY shall maintain a toll-free telephone number for utilization by the ~~"THE FUND"'s~~ [the Fund's] Participants in accessing Provider information.

## III. ADMINISTRATIVE SERVICES TO BE
## PROVIDED BY ~~"The Fund"~~ [THE FUND]

A. <u>Eligibility Determination and Verification</u>

-5-

*[handwritten: FUND]*

1. The "~~THE FUND~~" shall be responsible for determining the eligibility of individuals as Participants.

*[handwritten: FUND]*  *[handwritten: FUND'S]*

2. The "~~THE FUND~~" shall be responsible for verifying the eligibility of individuals as Participants in accordance with the ~~Employer's~~ policies and procedures upon request by any Provider during normal business hours.

**B.** <u>Claims Adjudication</u>

*[handwritten: FUND]*

1. The "~~THE FUND~~" shall be responsible for the adjudication and processing of all claims for services provided by Participating Providers and other healthcare Providers.

*[handwritten: The FUND]*  *[handwritten: We need definit for This (Benefit + Plan)]*

2. "~~THE FUND~~" shall have final authority to decide all questions of eligibility for Plan participation as well as for payment of benefits to Participants under the Plan. "~~The Fund~~" shall process benefit appeals in accordance with the Appeal provisions contained in the Plan of Benefits.

*[handwritten: The Fund Shall]*  *[handwritten: Benefit Plan]*

3. "~~THE FUND~~" ~~agrees to~~ pay all Participating physician and ancillary healthcare Provider(s) in accordance with the payment schedules provided by HHICNY to the "~~THE FUND~~" and in accordance with the (Plan of Benefits.)  *[handwritten: FUND]*

*[handwritten: The Fund acknowledges]*  *[handwritten: The Fund]*

4. ~~The Fund~~ ~~agrees~~ that amounts due to Providers under the Benefit Plan shall be remitted directly to Providers. "~~THE FUND~~" shall issue an EOB to both the Participant and the Provider and identify the applicable *[handwritten: The Fund's]* payment amounts on the EOB. With respect to Participating Provider(s), ~~THE FUND~~" EOB shall indicate that any discounts reflected in such payment amounts are attributable to the status of the Provider as an HHICNY Participating Provider.

*[handwritten: The Fund]*

5. "~~THE FUND~~" shall process and pay a "clean claim" within thirty (30) calendar days following the receipt of such claim. With respect to in-network hospital or healthcare facility claims, "~~THE FUND~~" shall process and pay a "clean claim" within thirty (30) calendar days after receipt of such claim.

For purposes of this Provision "process and pay" means to adjudicate a claim, and issue payment or a notice of claim denial, as applicable.  *[handwritten: If claim it w: be proc paid whe da...]*

*[handwritten: the Fund]*  *[handwritten: the Fund]*

For purposes of this Provision "clean claim" means a claim for Covered Services provided by a Provider that contains or is accompanied by all information required by "~~THE FUND~~" to enable "~~THE FUND~~" to process the claim completely in accordance with its normal procedures and policies. Such information includes, but is not limited to, information which clearly identifies the Participant who received services, proper coding, any routinely required information concerning prior authorization or concurrent authorization of services by a Utilization Management Provider, and any other documentation reasonably required to illustrate that healthcare services were medically necessary and otherwise covered

by the Benefit Plan. *The Fund*

A "clean claim" shall not include a claim containing or accompanied by information that "THE FUND", under its usual operating standards and procedures regarding third-party liability (including, without limitation, coordination of benefits, subrogation, or workers compensation) determines raises a reasonable possibility that a third party is liable for all or part of a portion of the Covered Services for which the claim was made. *The Fund*

6. "THE FUND" shall review and audit claims where appropriate to detect unreasonable Provider fees and unnecessary services practices and shall pay claims for only those Covered Services that are Medically Necessary.

7. The "THE FUND" agrees to *Fund shall* adjudicate claims in accordance with applicable law, including, but not limited to the Department of Labor's Claims and Appeals Regulations.

8. The "THE FUND" *Fund* acknowledges that failure to adhere to the following guidelines for the payment of claims may result in the negation of any discount that would apply, in the event such failure is due solely to the "THE FUND"'s *Fund's* actions and not attributable to HHICNY's responsibilities under this Agreement:

a. "THE FUND" *The Fund* will inform network Providers of any activity, which might delay the payment of a claim within thirty (30) days of receipt of that claim. This includes subrogation, coordination of benefits, and auto insurance recovery.

b. In the event that there is a dispute between "THE FUND" *the Fund* and a Provider, "THE FUND" *The Fund* will notify HHICNY of such dispute within thirty (30) days of receipt of the claim. HHICNY shall make every effort to resolve the dispute. In the event that "THE FUND" *The Fund* fails to notify HHICNY of a disputed claim, "THE FUND" *The Fund* may not dispute the claim. *The Fund*

c. "THE FUND" *The Fund* will verify eligibility within twenty-four (24) hours of receipt of the request. *? Benefit Plan?*

d. The plan design must encourage Participants to utilize the Panel. *The Fund*

e. "THE FUND" *The Fund* will communicate any *Benefit* Plan design changes to HHICNY at least sixty (60) days prior to the effective date of such change.

f. Any software system that might affect the amount paid to the network Provider must be approved by HHICNY. HHICNY hereby approves the "THE FUND"'s *Fund's* utilization of its current software system.

9. <u>Participant Communication</u>

    a. ~~"THE FUND"~~ *The Fund* shall arrange to identify HHICNY on all relevant communications to Participants regarding the ~~Employer's~~ *Fungl's* Medical and Hospital Program.

    b. ~~"THE FUND" agrees to~~ *The Fund shall* notify Participants of the names and locations of Participating Providers through the means of distribution of Participating Provider Directories. Such directories ~~shall be updated and distributed in a timely fashion.~~ ⟹ *By the Fund*

*By HHICNY?*

    c. ~~"THE FUND"~~ *The Fund* shall notify HHICNY, in writing, of any complaints by Participants regarding Participating Provider(s).

10. Compensation to HHICNY

~~"THE FUND"~~ *The Fund* shall compensate HHICNY for services rendered pursuant to this Agreement in accordance with Section VI of this Agreement.

11. Furnishing of Documents

~~"THE FUND"~~ *The Fund* shall promptly furnish all Plan documents and all other information reasonably required by HHICNY to perform its obligations under this Agreement. ~~"THE FUND"~~ *The Fund* shall also establish and maintain all accounts and records necessary to assist HHICNY in performing such obligations. HHICNY shall not be considered to have failed to perform its obligations under this agreement if any delay or non-performance is due, in whole or in part, to ~~"THE FUND"~~'s failure to promptly discharge any of its obligations under this Agreement. ⟹ *The Fund's*

-8-

## IV. FEE STRUCTURE

A.    In consideration for the services rendered by HHICNY during the course of this Agreement, "THE FUND" agrees to compensate HHICNY as follows:

*[handwritten: If the Fund shall]*

Rate

**From June 1, 2003 to May 31, 2004**

| Total TCS/Horizon Contracts (ASO Hospital Only and NSA) | 1-9,999 | 10,000-19,999 | 20,000+ |
|---|---|---|---|
| **Individual Funds' Total Contracts** | | | |
| 1-3,333 | $4.75 | $4.50 | $4.25 |
| 3,334-6,666 | $4.50 | $4.25 | $4.00 |
| 6,667+ | $4.25 | $4.00 | $3.75 |

**From June 1, 2004 to May 31, 2005**

| Total TCS/Horizon Contracts (ASO Hospital Only and NSA) | 1-9,999 | 10,000-19,999 | 20,000+ |
|---|---|---|---|
| **Individual Funds' Total Contracts** | | | |
| 1-3,333 | $5.00 | $4.75 | $4.50 |
| 3,334-6,666 | $4.75 | $4.50 | $4.25 |
| 6,667+ | $4.50 | $4.25 | $4.00 |

**From June 1, 2005 to May 31, 2006**

| Total TCS/Horizon Contracts (ASO Hospital Only and NSA) | 1-9,999 | 10,000-19,999 | 20,000+ |
|---|---|---|---|
| **Individual Funds' Total Contracts** | | | |
| 1-3,333 | $5.25 | $5.00 | $5.00 |
| 3,334-6,666 | $5.00 | $4.75 | $4.50 |
| 6,667+ | $4.75 | $4.50 | $4.25 |

*[handwritten left: I They let HHICNY was for these ?]*

Standard Directories* $4.80   each plus shipping

ID Cards- $.75 Per card produced

"customized directories "at HHICNY's cost"

*[handwritten right: I Theyl They were pay for th]*

B.    In the event that "THE FUND" requests that HHICNY produce additional communications materials, "THE FUND" shall reimburse HHICNY for the production of such materials at HHICNY's cost.  *[handwritten: The Fund]*

C.    At the beginning of each month, "THE FUND" shall provide HHICNY with an

-9-  *[handwritten: The Fund]*

Nov-21-2007 07:45pm From-WELFARE PENSION 272  Document 18-14  12/21268737  Filed 07/14/2008  Page 9 of 11  T-202  P.012/022  F-922

Case 1:08-cv-04428-LTS

eligibility count. HHICNY shall then provide the ~~THE FUND~~ with an invoice for the above services based on such count. ~~"THE FUND"~~ shall wire the amount due to HHICNY within 10 business days of receipt of such invoice. ~~"THE FUND"~~ shall wire payment to a financial institution designated by HHICNY. *The Fund*

*(FUND) → The Fund*

*The Fund*

D.  In the event that ~~"THE FUND"~~ fails to remit payment to HHICNY within 10 business days of receipt of HHICNY's invoice, ~~"THE FUND"~~ shall be assessed a late charge. Such late charge shall be assessed at an interest rate of 1.5 percent above the prime rate. *The Fund,*

*the Fund*

# V. RELATIONSHIP OF THE PARTIES

**A.  Independent Contractors**

The Parties to this Agreement shall be independent contractors and not joint ventures.

Neither Party shall have the authority to enter into contracts or otherwise deal with third parties on behalf of, or as an agent for, the other Party without the other Party's specific written authorization.

**B.  Data Transfer to Third Parties**

It is acknowledged that it may be necessary from time to time for either Party in performing its duties hereunder, to make available to independent contractors, agents, or employees documents belonging to the other Party. Each Party to this Agreement agrees that all documents belonging to the other Party and/or containing data belonging to the other Party shall not be made available to said third parties without the prior written approval of the Parties to whom the data belongs. Both Parties further agree to secure from any such third parties confidentiality and hold harmless agreement in a form reasonably acceptable to the other Party.

**C.  Subcontracting**

Neither Party shall subcontract a material portion of this Agreement.

For purposes of this Section, "subcontract" means to enter into a contract or arrangement with an entity making such entity responsible for a material obligation of either Party under this Agreement.  Such material obligations include, but are not limited to, making decisions regarding: administrative functions such as credentialing or re-credentialing of Participating Provider(s), negotiation of Participating Provider reimbursement, and communications with Participating Providers(s); repricing of claims; adjudication and paying claims; and/or resolution of Participant complaints.

Nothing contained herein shall be construed to prevent either Party from independently operating or participating in any other agreement concerning healthcare services independent of this Agreement.

## XI. INDEMNIFICATION AND INSURANCE

A.  Indemnification and Hold Harmless

*the Fund shall*

Notwithstanding any other provisions of this Agreement, "THE FUND" agrees to defend at its sole expense, indemnify and hold harmless HHICNY against all claims; judgements, or administrative expenses and benefit payment requirements, including legal fees, that may result at any time arising from, or *the Fund* due to functions HHICNY has not assumed, or delegated to "THE FUND", under this Agreement or due to "THE FUND"'s failure to comply with any law or regulations. This includes, but is not limited to any noncompliance with COBRA, mandated benefit provisions if applicable, and any applicable Medicare Secondary Payor Provisions. *The Fund's*

Additionally, notwithstanding any other provisions of this Agreement, "THE *the Fund* FUND" agrees to defend at its sole expense, indemnify and hold harmless *Shall* HHICNY against all claims, judgements, or administrative expenses and benefit payment requirements, including legal fees, for any taxes and assessments, including penalties, interest, or any other amounts, legally levied based upon the terms of this Agreement, other than based upon HHICNY's income, unless "THE *the Fund* FUND" notifies HHICNY, in writing, that, in the opinion of "THE FUND"'s legal counsel (such opinion to be final) that such taxes and/or assessments have not *the Fund's* been legally levied against the Program. "THE FUND" agrees to hold HHICNY harmless and indemnify HHICNY for any losses which result from HHICNY's actions taken in reliance upon the "THE FUND"'s Legal Counsel's opinion. This provision shall apply to any amounts imposed, now or later, under the authority of any federal, state, or local taxing jurisdiction and shall continue in effect after termination of this Agreement. *Fund's* *The Fund shall*

B.  HHICNY Indemnification and Hold Harmless

*by the Fund*

Notwithstanding any other provisions of this Agreement, HHICNY shall at all times indemnify and hold harmless "THE FUND", its Trustees, Officers, and Employees against any loss, costs, liabilities, and expenses (including, but not limited to, attorney fees and court costs) resulting from or in connection with any function HHICNY has undertaken, and not delegated to "THE FUND", pursuant *The* to this Agreement, where it has been determined that the liability was the result *Fund* of any negligence, willful misconduct, malfeasance, fraudulent acts, breach of this Agreement or of applicable law, or failure to meet any fiduciary obligations imposed upon HHICNY, provided however that "THE FUND" shall remain liable for the payment of all claims under the Benefit Plan. *The Fund*

C.  HHICNY Insurance

HHICNY, at its sole expense, agrees to maintain Managed Care Liability Insurance.

D.  Healthcare Providers' Insurance

1.  Physician Insurance. HHICNY represents that the agreement with each participating physician in the Panel requires such physician to maintain Professional Liability Insurance in the amount of at least $1,000,000 per claim, and $3,000,000 in the aggregate.

2.  Hospital Providers. HHICNY represents that the agreement with each Participating Provider of hospital services in the Panel requires such Provider to maintain Professional Liability Insurance in the amount of at least $1,000,000 per claim, and $3,000,000 in the aggregate.

3.  Ancillary Healthcare Service Providers. HHICNY represents that the its agreement with each Participating Provider of Ancillary Healthcare Services in the Panel requires such Provider to maintain Professional Liability Insurance in the amount of at least $1,000,000 per claim, and $3,000,000 in the aggregate.

Insurance

"THE FUND" represents and warrants that it has in place Managed Care Errors and Omissions Insurance in the amount of at least $5,000,000, as well as General Liability Insurance in the amount of $1,000,000 per occurrence, and $2,000,000 in the aggregate. In addition, "THE FUND" shall maintain an Excess Liability Policy with a single combined limit of no less than $20,000,000. "THE FUND" shall provide HHICNY with prior written notice of any modifications, cancellations, or terminations of any insurance coverage that may occur for any reason whatsoever unless replaced on or prior to the date of modification, cancellation, or termination with insurance in the same or greater dollar amounts.

# EXHIBIT E

Local 272

**Exhibit 2**
**Horizon Healthcare of NY**
**Regarding Self Funded Plans**
**January 2005 - February 2007**

| Facility Name | Number of Cases | Expected Amount | Total Payments | Balance Due |
|---|---|---|---|---|
| New York Methodist Hospital | 3 | $12,919 | $5,084 | $7,835 |
| New York Presbyterian Hospital - Columbia University Medical Center | 2 | $22,198 | $3,116 | $19,082 |
| New York Presbyterian Hospital - New York Weill Cornell Medical Center | 6 | $210,608 | $87,036 | $123,572 |
| Nyack Hospital | 1 | $4,376 | $1,000 | $3,376 |
| The New York Hospital Medical Center of Queens | 20 | $225,912 | $64,675 | $161,139 |
| Grand Total | 32 | $477,013 | $160,911 | $315,004 |

Page 1 of 1

Printed 11/16/2007 3:39 PM

Exhibit 1
Amounts Due from Horizon Healthcare of NY
Regarding Self Funded Plans Who Paid at the Fully Insured Rate
January 2005 - February 2007

| Facility Name | Number of Cases | Expected Amount | Total Payments | Balance Due |
|---|---|---|---|---|
| New York Methodist Hospital | 8 | $173,996 | $92,884 | $81,112 |
| New York Presbyterian Hospital - Columbia University Medical Center | 3 | $14,921 | $11,991 | $2,930 |
| New York Presbyterian Hospital - New York Weill Cornell Medical Center | 2 | $89,661 | $67,551 | $22,110 |
| Nyack Hospital | 2 | $791 | $299 | $492 |
| The New York Hospital Medical Center of Queens | 25 | $376,339 | $163,512 | $212,827 |
| Grand Total | 40 | $655,708 | $336,237 | $319,471 |